# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 3 0 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

| | | |
|---|---|---|
| LEON JERMAIN WINSTON,<br>　　　　Petitioner, | )<br>) | Civil Action No. 7:07cv00364 |
| | ) | |
| v. | )<br>) | **MEMORANDUM OPINION** |
| | ) | |
| LORETTA K. KELLY, Warden,<br>Sussex I State Prison,<br>　　　　Respondent. | )<br>)<br>) | By: Samuel G. Wilson<br>United States District Judge |

　　　　A jury in the Circuit Court for the City of Lynchburg, Virginia found petitioner, Leon Jermain Winston, guilty of three counts of capital murder and sentenced him to three death sentences. Having exhausted his state court remedies, Winston filed a habeas petition in this court pursuant to 28 U.S.C. § 2254 claiming actual innocence and raising more than 30 other claims. The court rejects his claim of actual innocence and all of his other claims except two interrelated claims: the claim that because he is mentally retarded, Atkins v. Virginia, 536 U.S. 304 (2002), bars his execution, a claim he procedurally defaulted because he failed to raise it at trial, and the claim that his counsel was ineffective in relation to that claim, thereby excusing his procedural default. The court finds that an evidentiary hearing is appropriate to resolve those claims.

## I. The Facts

　　　　In affirming Winston's conviction and sentence on direct appeal, the Supreme Court of Virginia summarized the facts as follows:

　　　　On the morning of Friday, April 19, 2002, Rhonda and Anthony Robinson ("Rhonda" and "Anthony") were shot and killed in their home at 410 Sussex Street in Lynchburg. When police arrived, they found that the rear door to the house had been

forcibly opened. Anthony's body was at the foot of the stairs and five 9-millimeter shell casings were found around and under his body. Rhonda's body was found on the floor of the upstairs bedroom shared by her two daughters. Four 9-millimeter shell casings were found upstairs.

Autopsies were performed on both Rhonda and Anthony. Toxicology reports found no indication of alcohol, opiates, or cocaine in either. The medical examiner concluded that all wounds were inflicted upon both victims while they were alive. The medical examiner also concluded that Rhonda was pregnant at the time she was murdered.

Anthony died from blood loss caused by eight gunshot wounds to his head, chest, abdomen, and upper and lower extremities.[1] In numbering the bullet wound tracks, the medical examiner did not indicate the sequence in which Anthony was shot. However, the medical examiner established that a 9-millimeter semi-automatic handgun caused tracks 1 through 7 and a .38 caliber revolver caused track 8.

The bullet in track 1 entered Anthony's head above and behind his left ear, passed through his skull causing a "large amount of destruction" before exiting through his right eye. The bullet in track 2 entered Anthony's right jaw and exited out of his mouth. The bullet in track 3 grazed the surface of Anthony's left cheek before it entered his chest, damaged his left lung and heart, and stopped in his abdomen. The bullet in track 4 passed front-to-back through Anthony's right shoulder. The bullet in track 5 passed from right to left through the subcutaneous tissue of Anthony's abdomen. The bullet in track 6 entered Anthony's left upper back, and then passed through his ribs, left lung, heart, liver, and stomach. The bullet in track 7 entered Anthony's right thigh and then passed through it. The .38 caliber bullet in track 8 entered the right side of Anthony's groin at the base of his penis, and passed through the left scrotal sac before lodging in his left thigh.

Rhonda's death was caused by blood loss due to eight gunshot wounds. The medical examiner identified three wound tracks associated with these wounds. The bullet that caused the first wound track entered at the top of her head and passed through her forehead. The bullet that caused the second wound track passed through Rhonda's chin into her neck and chest, where it hit major blood vessels before exiting through her back. The bullet that caused the third wound track passed through Rhonda's neck.

Evidence at trial revealed that on the morning of April 19, 2002, then eight-year-old Niesha M. Whitehead ("Niesha") was awakened by Rhonda, her mother, calling out that "someone is in the house." Niesha saw two black men outside the second floor bedroom she shared with her sister, Tiesha, then five years old. Niesha testified that she saw her stepfather, Anthony, go downstairs with one of the two men. This man was

---

[1]The court notes that the trial transcript shows that Anthony died from blood loss from fifteen gunshot wounds associated with eight bullet tracks through his body. A single bullet may cause multiple wounds. For example, a bullet could make an entry wound as well as an exit wound.

2

dressed in black clothing and wore gloves. Niesha called him "Mr. No Name." She testified that "Mr. No Name" had a tattoo that looked like "a big dog." Significantly, Winston concedes that he was present on this evening, but asserts on brief before us that he did not shoot anyone. As between Winston and the other man who was an intruder in the home, Kevin Brown ("Brown"), Winston is the person with a tattoo of a dog on his arm. Niesha testified that after Anthony went downstairs with "Mr. No Name," she heard shots.

Brown, who Niesha called "Mr. No Name's Friend," stayed upstairs with Rhonda until "Mr. No Name" came back upstairs. "Mr. No Name" chased Rhonda into the girls' bedroom and shot Rhonda in front of the girls. Niesha led her sister to a closet where the two girls hid. Later, Niesha left the closet and discovered the bodies of her mother and stepfather.

A cab driver testified that he picked up two black males, one of whom he identified as Brown, in the early morning hours of April 19, 2002. He drove the men to several homes where the two men would leave the cab and walk around the house checking the windows, but not entering the houses. He remembered that one of the houses was on Sussex Street. The Robinson home was on Sussex Street.

Michelle Lipford, who had purchased drugs from Winston and Brown in the past and had been sexually intimate with Winston, testified that at about 5:00 a.m. on April 19, 2002, she drove Winston and Brown to the Robinsons' home on Sussex Street. She testified that she parked a block away from the Robinson home and Winston and Brown left the car for approximately 5 minutes and then returned. They went to her home on Pierce Street. Winston and Brown asked her to drive them back to Sussex Street. She complied and parked a block away from the Robinson home. Winston and Brown got out of the car. After about 15 minutes, Lipford heard gunshots and drove away.

Tranika Turner [], Winston's girlfriend, received a call from Winston at about 6:00 a.m. on the morning of April 19, 2002 asking her to pick him up at a carwash, a short distance from Sussex Street. She did so.

The evidence revealed that Carrie Wirges, a neighbor of the Robinsons, was awakened by gunshots on the morning of April 19, 2002. She described hearing three shots and then five shots.

Nathan Rorls ("Rorls"), a longtime friend of Winston's, testified that Winston telephoned him and stated that "he slumped two people down here," meaning that he "murdered somebody; killed somebody." When Rorls saw Winston the next day, Winston stated that he "killed two people and robbed them and stuff." Winston produced a handgun from under his shirt. Rorls described it as "a black gun like an automatic [, it] was like a Glock or a nine." Winston also displayed cash and cocaine that he stated he took from the Robinsons. He told Rorls that he and Brown took $2000 and two ounces of cocaine.

Rorls recited what Winston told him. According to Winston, Brown took Anthony downstairs and shot him first in the stomach. Winston then shot Anthony when he came "running up the steps talking about they robbing us." Rorls testified that,

Case 7:07-cv-00364-SGW   Document 39   Filed 05/30/08   Page 3 of 53   Pageid#: 660

So [Winston] said he shot him like up in the face or somewhere in the upper body coming up the stairs. And he told me, he said, he don't want to leave no witnesses, so he turned around and he shot that bitch.

Winston told Rorls that he committed these crimes because he had been robbed several days earlier and "he needed to make his money back up, he didn't get paid." Rorls also stated that Winston told him that Rhonda was pregnant.

Winston was arrested at his girlfriend, [Tranika] Turner's, home on April 25, 2002. [Tranika] Turner gave police a set of keys that Winston left in her house. The keys fit locks to doors at two nearby apartments. At one of the apartments, occupied by Robin Wilson ("Wilson"), the police recovered a 9-millimeter off-brand handgun manufactured by a company located in Tennessee and made to resemble a Glock. Winston had left the handgun with Wilson to "hold" for him, and had failed to retrieve it before he was arrested. Winston had called Wilson from jail after he was arrested and requested Wilson to continue to "hold" it.

Winston's handgun seized by police at Wilson's apartment had one unspent round in the clip magazine. The cartridge bore the identical stamping as the casings recovered at the Robinson murder scene. A forensic scientist testified at trial that five bullets recovered from the Robinsons' home and two bullets removed from Anthony's body were fired from Winston's 9-millimeter handgun recovered from Wilson's apartment. Nine cartridge casings recovered at the crime scene had been ejected from Winston's 9-millimeter handgun. Another forensic scientist testified that biological material recovered from the 9-millimeter handgun matched Winston's DNA profile and was inconsistent with Brown or either of the Robinsons. The probability of a random selection yielding this result was greater than one in six billion.

Winston v. Commonwealth, 604 S.E.2d 21, 26-28 (2004), cert. denied, 546 U.S. 850 (2005).


## II. Procedural History

Winston was convicted in the Circuit Court of the City of Lynchburg of capital murder of

Anthony Robinson in the commission of attempted robbery; capital murder of Rhonda

Whitehead Robinson in the commission of attempted robbery; capital murder of Rhonda

Whitehead Robinson during the same act or transaction in which another person was willfully,

deliberately, and with premeditation killed; two counts of attempted robbery; statutory burglary;

4

maliciously discharging a firearm; and five counts of use of a firearm in the commission of a felony.

The jury fixed Winston's punishment at death for each of the three capital murder convictions and at seventy-three years for the remaining convictions. The jury found the aggravating factors of vileness and future dangerousness in each of the three capital offenses. The trial court sentenced Winston in accordance with the jury verdict.

The Supreme Court of Virginia affirmed Winston's convictions and upheld the sentences of death on Winston's direct appeal, Winston v. Commonwealth, 604 S.E.2d 21 (2004), cert. denied, 546 U.S. 850 (2005). Winston filed a petition for a writ of habeas corpus with the Supreme Court of Virginia, which dismissed the petition without an evidentiary hearing. Winston v. Warden of Sussex I State Prison, No. 052501, 2007 WL 678266 (Va. Mar. 7, 2007). The state court also denied Winston's outstanding motions for discovery, for funds to hire a mental health expert, for leave to depose the Department of Forensic Science, and for the appointment of a DNA expert and discovery of electronic data. Id. at *18. Winston filed a motion for rehearing on April 6, 2007 which was denied on June 22, 2007. The Circuit Court for the City of Lynchburg scheduled Winston's execution date for August 1, 2007.

On July 27, 2007, Winston filed a motion in this court to stay his scheduled August 1, 2007 execution, a Notice of Intent to File for a Writ of Habeas Corpus, and a Motion to Appoint Counsel. On July 30, 2007 this court stayed Winston's execution, granted his Motion to Proceed In Forma Pauperis, appointed counsel, and ordered Winston to file his federal Petition for Writ of Habeas Corpus within ninety days. On October 29, 2007, Winston, through counsel, filed a Petition for Writ of Habeas Corpus and on November 16, Winston filed an Amended Petition for

Writ of Habeas Corpus. Although Winston brings dozens of claims in this petition, most fall into two categories: (1) The Commonwealth concealed evidence or knowingly presented misleading evidence so as to deny Winston's due process rights and (2) Winston's trial counsel was ineffective in failing to object to the Commonwealth's actions, or in failing to investigate and present evidence and argument on Winston's behalf.[2]

### III. Standards of Review

Winston's petition is governed by 28 U.S.C. § 2254 and chapter 154 of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. §§ 2261-66 (2000). In almost all circumstances, petitioners under § 2254 must exhaust all available state court remedies before seeking relief in federal court. § 2254(b). When reviewing a claim adjudicated on the merits by a state court – as most of Winston's claims have been – a federal court may grant habeas relief only if the state court adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." §§ 2254(d)(1), (d)(2). A state court adjudication is considered contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court decision unreasonably applies clearly established federal law if the court

---

[2]A complete list of Winston's claims is attached as an appendix to this opinion.

6

identifies the correct legal principle, but unreasonably applies it to the facts of the case. Id. at

413. It is not enough that a state court applied federal law incorrectly; relief may only be granted

if the application of federal law is unreasonable. Id. at 411. Factual determinations made by the

state court are "presumed to be correct," and the petitioner has the burden of rebutting that

presumption of correctness by "clear and convincing evidence." § 2254(e)(1).

 When a state court has expressly relied on an adequate and independent state procedural

rule to deny relief on a claim (procedural default), that adequate and independent state procedural

rule also bars federal review unless the petitioner shows either (1) cause and prejudice or (2) a

miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750 (1991).[3] To show cause, a

petitioner must demonstrate that there were "objective factors," external to his defense, which

impeded him from raising his claim at an earlier stage. Murray v. Carrier, 477 U.S. 478, 488

(1986). To show prejudice, a petitioner must show that the alleged constitutional violation

worked to his actual and substantial disadvantage, infecting his entire trial with error of a

constitutional magnitude. Id. at 488. A valid nondefaulted ineffective assistance of counsel

claim can constitute cause and prejudice and, thereby, excuse a procedural default. Edwards v.

Carpenter, 529 U.S. 446, 451-52 (2000). The "miscarriage of justice" exception is a narrow

exception to the cause requirement. A habeas petitioner falls within this narrow exception if he

---

[3]"A state procedural rule is adequate if it is regularly or consistently applied by the state courts, Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and it is independent if it does not depend on a federal constitutional ruling, Ake v. Oklahoma, 470 U.S. 68, 75 (1985)." McNeill v. Polk, 476 F.3d 206, 211 (4th Cir. 2007). Therefore, a violation of "firmly established and regularly followed state rules" is adequate to foreclose review. Lee v. Kemna, 534 U.S. 362, 375 (2002). "[W]henever a procedural rule is derived from state statutes and supreme court rules . . . the rule is necessarily 'firmly established.'" O'Dell v. Netherland, 95 F.3d 1214, 1241 (4th Cir. 1996), aff'd 521 U.S. 151 (1997).

7

can demonstrate that a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Murray, 477 U.S. at 496. The exception also applies in a capital case, where "the concept of 'actual innocence' [does] not translate neatly into the capital sentencing context" where the petitioner is able to show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." Sawyer v. Whitley, 505 U.S. 333, 336 (1992).

## IV. Claims of Actual Innocence
### (Winston's Claims I(A), I(B) and II(D)(1))

Winston argues that he is entitled to relief, and in the alternative relief from his procedural defaults, because he is actually innocent of capital murder.[4] Winston argues that he is actually innocent because he was not the triggerman and, therefore, not a principal in the first degree, an element of capital murder in Virginia. Va. Code Ann. §§ 18.2-31, 18.2-18 (2006); Frye v. Commonwealth, 345 S.E.2d 247, 280 (1986) ("Under the so-called triggerman rule, only the actual perpetrator of a crime delineated in [Virginia] Code § 18.2-31 may be convicted of capital murder and subjected to the penalty of execution, except in the case of murder for hire."). This court has conducted a searching review of all the evidence, old and new, and has concluded

---

[4]Although Winston argues he is entitled to relief because he is actually innocent, the Supreme Court of the United States has made clear that actual innocence is not a cognizable freestanding claim for habeas relief. "[O]ur habeas jurisprudence makes clear that a claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Herrera v. Collins, 506 U.S. 390, 404 (1993). This court, therefore, considers Winston's actual innocence claim only as a gateway to his constitutional claims, and not as a freestanding constitutional claim that would entitle Winston to relief.

8

that Winston cannot meet the demanding actual innocence standard required of a convicted prisoner.

Actual innocence means "factual innocence not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). To show actual innocence as a gateway to his defaulted claims, Winston must establish that in light of new evidence, evidence not presented at trial, "it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. Schlup v. Delo, 513 U.S. 298, 327 (1995).[5] In determining whether Winston has met this standard, this court, as a habeas court, "must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the 'rules of admissibility that would govern at trial.'" House v. Bell, 547 U.S. 518, 538, (2006) (quoting Schlup, 513 U.S. at 327-28). It must then make "a probabilistic determination about what reasonable, properly instructed jurors would do." Schlup, 513 U.S. at 329. "[B]ecause a Schlup claim involves evidence the trial jury did not have before it, the inquiry requires a federal court to assess how reasonable jurors would react to the overall, newly supplemented record." House, 547 U.S. at 519. With these precepts in mind the court turns to Winston's new evidence, which is essentially this: the Commonwealth's DNA evidence from the 9-millimeter murder weapon is flawed and Rorls, a key Commonwealth witness, has recanted.

Winston claims to have newly uncovered DNA evidence supporting his actual innocence claim, and has filed the affidavit of a DNA expert, Dr. David McClintock, who is

---

[5] To the extent a capital petitioner contests the special circumstances rendering him eligible for the death penalty, "[a] 'clear and convincing' standard applies, irrespective of whether the special circumstances are elements of the offense of capital murder or . . . mere sentencing enhancers." Calder v. Thompson, 523 U.S. 538, 560 (1998).

9

critical of the Commonwealth's handling and analysis of DNA evidence. The "new" DNA evidence distills to this: according to McClintock, a Department of Forensic Science ("DFS") analyst characterized alleles from the DNA record on the 9-millimeter firearm as stutter (a "false allele") even though the strength of the related "bands suggest that they represent actual alleles rather than stutter." (App. 423 ("App." refers to the incomplete appendix Winston filed in this court with his petition; other cites refer to "J.A.," the more complete joint appendix filed on Winston's direct appeal.).) In McClintock's words, "[t]hese classifications have critical importance, because if these bands represent actual alleles rather than stutter, this would indicate a DNA mixture of more than one contributor on the murder weapon." Id. This court finds, however, that in this context, the possibility that someone else's DNA is on the firearm is far from transformative. According to the evidence at trial, the police retrieved the murder weapon from Robin Wilson's apartment. According to Wilson, Winston asked Wilson to "hold" it for him, failed to retrieve it before he was arrested, and called Wilson from jail after he was arrested and asked Wilson to continue to "hold" it. (Joint Appendix at 2386-90, Winston v. Commonwealth, 604 S.E.2d 21 (2004) (joint appendix filed by Winston's trial counsel and the Commonwealth on Winston's direct appeal, hereinafter referred to as "J.A.").) Therefore, it would not be remarkable if Wilson's DNA or someone else's DNA were on the weapon. In short, Winston possessed the murder weapon, and the presence of someone else's DNA is not the kind of new evidence that lends itself to the conclusion that it is more likely than not that no reasonable juror would have convicted Winston if that new evidence had been presented.

Winston's other new evidence comes from Rorls. Rorls signed an affidavit on October 29, 2007 essentially recanting his trial testimony. According to Rorls' affidavit, although

10

Winston met Rorls in a Woodbridge, Virginia apartment soon after the murders, contrary to Rorls' trial testimony, Winston did not tell Rorls that he killed Anthony and Rhonda, and did not show Rorls a firearm or the drugs he took from them. (App. 1116.) Instead, according to Rorls' affidavit, Tywan Turner ("Turner") (an associate of Winston, Rorls, and Anthony Robinson, and the man who Winston contends actually committed the murders) came to Rorls' Greenbelt, Maryland apartment that same evening to obtain drugs from Lamont Tucker, who rented that apartment with Rorls. (App. 1116.) According to Rorls' affidavit, Turner recounted that Turner had gone to the Robinsons' apartment "to get his drugs back." (App. 1116.) Turner asked Rorls not to tell Tucker because Turner believed Tucker would not give him drugs "if he knew that [Turner] had just been involved in a murder over drugs." (App. 1116-17.) According to Rorls' affidavit, he lied at Winston's trial because Rorls was facing federal charges and was seeking a more lenient sentence. (App. 1118.) He now claims to be willing to tell the truth because he received a more lenient sentence and has been released from prison. (App. 1119.)

The court finds that the new evidence from Rorls fares no better in advancing Winston's claim of actual innocence than Winston's new DNA evidence. According to Rorls' new version of events, Turner did not tell Rorls that Winston was not present or not involved in the murders. Indeed, Winston does not dispute that he was present during the murders. Therefore, these hard cold circumstances remain: there is evidence that Winston had a motive, had the opportunity, and possessed the murder weapon. Against this backdrop, the "new evidence" from Rorls, even if fully credited and considered with the "new" DNA evidence, does not lead the court to conclude that it is more likely than not that no reasonable juror would have convicted Winston if that new evidence had been presented. More fundamentally, the court notes that Winston did not testify at

11

trial, as was his right, and he continues to exercise his right to remain silent, having failed to

offer his own affidavit to establish his actual innocence. Actual innocence, for purposes of

federal habeas corpus, however, is factual innocence, not legal innocence. It follows that

Winston has not presented a credible claim of "actual innocence." Accordingly, the court denies

Winston's claim that he is actually innocent. (claims I(A), I(B), and II(D)(1)).


### V. Claims Relating to DNA Evidence
### (Winston's Claims II(D)(2) and II(D)(3))

Winston makes three claims that the Commonwealth suppressed exculpatory DNA

evidence in violation of his due process rights under Brady v. Maryland, 373 U.S. 83 (1963): (1)

the Commonwealth failed to disclose "electronic data"; (2) the Commonwealth failed to reveal

that DNA evidence suggested multiple contributors to the DNA sample taken from the 9-

millimeter murder weapon; and (3) the Commonwealth failed to disclose disagreements between

DFS analysts bearing on the reliability of their results. Winston also claims that his counsel was

ineffective in failing to discover and present evidence that the Commonwealth's DNA testing and

analyses were flawed. On state habeas review, the Supreme Court of Virginia found Winston's

Brady claim regarding "electronic data" to be without merit, procedurally defaulted the

remaining Brady claims, and denied the ineffective assistance claim. This court concludes that

the Supreme Court of Virginia's denial of Winston's undefaulted claims – his Brady claim

regarding "electronic data" and his ineffective assistance claim – did not involve an unreasonable

application of clearly established federal law or an unreasonable determination of the facts in

light of the evidence presented in the state court proceedings. This court concludes that the

Supreme Court of Virginia found Winston's remaining Brady claims procedurally defaulted on

12

the basis of an adequate and independent state procedural rule and that Winston has failed to demonstrate either cause and prejudice or a fundamental miscarriage of justice relieving him of that default. Accordingly, the court will dismiss these claims.

Before Winston's trial, DFS analysts, supervised by the Commonwealth's DNA expert, Nicole Harold ("Harold"), examined the physical evidence, extracted samples of DNA from multiple items, and compared those samples against DNA profiles from Winston, Brown, Anthony, Rhonda, and David Hardy (an associate of Brown's). (J.A. 2537-48.) During pre-trial discovery, the trial court ordered the Commonwealth to give Winston its complete DNA file, including all photographic and numeric DNA data, Harold's own notes, laboratory notes, and DFS's reported results. (J.A. 570.) The record shows the Commonwealth complied with the order. (J.A. 2633.) The trial court also appointed a DNA expert, Megan Clement ("Clement"), to assist Winston and offered to order the services of DFS laboratories for "any additional testing that [Winston wanted] done." (J.A. 102.) Clement reviewed the file turned over by DFS and testified that it was "complete." (J.A. 2633.)

A. DNA-Related Brady Claim Adjudicated on Its Merits

Winston bases his claim that the Commonwealth withheld "electronic data" on the affidavit of DNA expert Dr. McClintock, which Winston filed here as he also did in the state habeas proceeding. McClintock's affidavit concludes that "a thorough, scientific and unbiased review of the data and scientific information in this case is needed. Such a review must include a re-interpretation of existing electronic data that is in the possession of DFS." (App. 424.) Based on McClintock's affidavit, Winston claimed on state habeas, as he does here, that the Commonwealth knowingly withheld electronic data in its possession that was exculpatory and

13

material. The Supreme Court of Virginia denied Winston's claim because it determined that Winston failed to identify the electronic data he claimed the Commonwealth withheld and could not demonstrate that it "contained either exculpatory or material information." This court concludes that decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The trial court ordered the Commonwealth to give Winston the complete DNA file, and Winston's court-appointed expert, Clement, testified at trial that she had reviewed the file and that it was "complete." (J.A. 2633.) McClintock prepared his affidavit after the trial using the same information in the file which Clement reviewed before trial for her testimony. (See App. 419 for McClintock's description of the files he reviewed for his affidavit.) McClintock was able to determine from that same information that there may have been multiple DNA contributors to the 9-millimeter murder weapon, and that there were disagreements between DFS analysts which were not recorded in DFS's final report. (App. 423-24.) In his affidavit, McClintock suggested re-analyzing the original DNA information using "electronic data" in DFS's possession. (App. 424.) McClintock did not say that this data was in the exclusive possession of DFS or that it was data which DFS had not disclosed to Winston before trial. McClintock simply suggested that the electronic record of the data contained in the files which DFS turned over would be useful in rerunning the DNA analysis. Winston has not pointed to any fact which suggests that DFS suppressed any information at all, let alone any material or exculpatory evidence. Under the circumstances, the Supreme Court of Virginia's decision is unassailable; it did not involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this court

14

denies Winston's <u>Brady</u> claim relating to "electronic data." (claim II(D)(2)).

B. <u>Procedurally Defaulted DNA-Related Brady Claims</u>

The Supreme Court of Virginia found the two remaining <u>Brady</u> claims procedurally

defaulted. In the first, Winston argued that the Commonwealth failed to reveal the possibility

that someone other than Winston contributed to the DNA on the 9-millimeter murder weapon. In

the second, Winston argued that DFS analysts did not disclose differing conclusions from DNA

analyses in their report and that these disparities call into question the scientific reliability of

DFS's analytical methods. Winston based his first defaulted claim on McClintock's statement

that a DFS analyst characterized alleles for the DNA record on the 9-millimeter firearm as stutter

(a "false allele") even though the strength of the related "bands suggest that they represent actual

alleles rather than stutter." (App. 423.) In McClintock's words, "[t]hese classifications have

critical importance, because if these bands represent actual alleles rather than stutter, this would

indicate a DNA mixture of more than one contributor on the murder weapon." (App. 423.)

Winston based his second defaulted claim on McClintock's statement that analysts reported

*inconclusive* results at two points where they ought to have reported *inconsistent* results because

the primary and secondary DFS analysts reached different conclusions for those two points in the

analysis. (App. 424.)

The Supreme Court of Virginia found these two remaining <u>Brady</u> claims procedurally

defaulted under <u>Slayton v. Parrigan</u>, 205 S.E.2d 680 (Va. 1974). The Fourth Circuit has held that

<u>Slayton</u> is a procedural bar constituting an "adequate and independent state law ground for

default." <u>Vinson v. True</u>, 436 F.3d 412, 417 (4th Cir. 2006). Seeking to avoid <u>Slayton's</u>

procedural bar, Winston argues that "<u>Slayton</u> is not an independent and adequate procedural rule

15

because it is not consistently applied to <u>Brady</u> claims," (Pet. 30), and he cites examples of <u>Brady</u> claims raised for the first time either on appeal or on state habeas review not barred by <u>Slayton</u>. This court rejects the argument.

It is obvious that there are many instances in which <u>Brady</u> claims are not discoverable until trial is concluded: where the Commonwealth suppresses evidence, that evidence is necessarily unavailable to the defense to make a <u>Brady</u> claim at trial. In this circumstance, the Supreme Court of Virginia would have no reason to apply <u>Slayton</u>. The question, therefore, "is whether the particular procedural bar is applied consistently to cases that are *procedurally* analogous – here, cases in which the particular claim raised could have been raised previously but was not." <u>McCarver v. Lee</u>, 221 F.3d 583, 589 (4th Cir. 2000). Winston points to nothing that suggests that the Supreme Court of Virginia has failed to apply <u>Slayton</u> consistently to any class of claims, including <u>Brady</u> claims, when those claims could have been raised previously but were not. Accordingly, the court rejects Winston's argument that <u>Slayton</u> is not an independent and adequate procedural rule barring review of this <u>Brady</u> claim on federal habeas.

Winston argues alternatively that even if <u>Slayton</u> is an independent and adequate bar to his <u>Brady</u> claim, two grounds excuse his procedural default. First, he claims that his actual innocence excuses his procedural default. Since the court has already determined that Winston cannot satisfy the demanding actual innocence standard, "actual innocence" cannot excuse his procedural default, and the court addresses it no further. Second, he claims counsel's ineffective assistance in failing to recognize and challenge deficiencies in the DNA evidence excuses his procedural default. He raises that alleged ineffective assistance both as excuse for his procedural default and as a freestanding claim. Winston also raised the same ineffective assistance as a

16

freestanding claim in his state habeas petition, and the Supreme Court of Virginia rejected the claim on the merits, concluding that Winston had satisfied "neither the performance nor prejudice prong of the two-part test enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984)." Winston v. Warden, 2007 WL 678266, at *3. Therefore, preliminary to deciding whether ineffective assistance excuses Winston's procedural default of his DNA-related Brady claims, the court must determine whether "the same claim of ineffective assistance of counsel get[s] reviewed differently when presented merely as cause for a procedural default as opposed to being presented in a petition as a basis in the first instance for habeas relief." Lee v. Davis, 328 F.3d 896, 901 (7th Cir. 2003). This court concludes that the review is the same.[6] Accordingly, the court considers below Winston's ineffective assistance claim both as a reason to excuse procedural default and as a free standing claim and denies it for both purposes.

---

[6]There is a split of authority as to whether a federal habeas court must continue to defer to the state court's adjudication of a freestanding ineffective assistance of counsel claim when the federal habeas court decides whether that claim constitutes cause for procedural default. One line of authority holds that the claim is reviewed de novo, Joseph v. Coyle, 469 F.3d 441, 459 (6th Cir. 2006); Fischetti v. Johnson, 384 F.3d 140, 154-55 (3d Cir. 2004); Green v. Johnson, 2007 WL 951686, at *3 (E.D. Va. Mar. 26, 2007), and the other that the court reviews the claim through AEDPA's deferential lens. Yarborough v. Johnson, 2006 WL 2583418, at *7 (E.D. Va. Sep. 5, 2006); Roberts v. Johnson, 2006 WL 1881002, at *4 (E.D. Va. Jul. 6, 2006); Orbe v. True, 233 F. Supp. 2d 749, 758-59 (E.D. Va. 2002). This court agrees with the latter line of authority for the reasons stated in a decision by the Eastern District of Virginia:

> [B]ecause [Edwards v. Carpenter, 529 U.S. 446, 451 (2000)] makes clear that "ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim" that must have been presented to the state court, there is a strong reason to believe that the state court's resolution of that ineffective assistance claim is subject to the same § 2254 principles as an ineffectiveness claim presented as a separate, substantive claim for habeas relief.

Powell v. Kelley, 531 F. Supp. 2d 695, 724 (E.D. Va. 2008). Accordingly, this court reviews Winston's ineffective assistance claim through AEDPA's deferential lens.

17

C. Ineffective Assistance of Counsel Claim

Winston argues that DNA testing methods used by DFS failed to meet minimum standards of scientific reliability. For that reason, Winston claims that his attorneys should have moved to suppress the Commonwealth's DNA evidence or, alternatively, should have pointed out to the jury alleged flaws in DFS's methods: (1) unreported differences in two DFS analysts' interpretations of the same data; (2) inappropriate manipulation of control samples; (3) inappropriate collaboration between scientists required to work independently; (4) questionable assessment of the physical DNA evidence – determining certain blurred marks to be "stutter" and not actual alleles; and (5) incorrect statistical methods to analyze results. Winston concedes that his own DNA expert called into question DFS's statistical analysis methods. However, Winston argues that his counsel should have moved to suppress based on the combination of the other alleged flaws in DFS's methods, or at least presented, in a more coherent fashion, evidence to the jury that the entire DNA analysis was unreliable.

The Supreme Court of Virginia noted that Winston's own, independent DNA expert, Clement, reviewed DFS's entire file. Clement testified that she disagreed with DFS's reported results on DNA taken from a glove found near the scene. She found that the DNA on that glove might have come from Winston, Brown, or the glove's owner, David Hardy. She also used a different statistical method and found a greater chance than DFS found that the DNA on the glove came from an individual other than Winston or Brown. Finally, she testified that her only disagreement with DFS's analysis concerned the DNA from the glove. Because counsel had an expert independently review all of DFS's data and counsel thoroughly developed Clement's challenges to DFS's analysis on direct examination, the Supreme Court of Virginia ruled that

18

Winston failed to show that his counsels' performance was deficient or prejudicial.

Winston argues that the Supreme Court of Virginia focused too narrowly on the DNA expert, Clement, rather than counsel when it denied his ineffective assistance claim. (Pet. 34-35.) Winston complains that his claim was that *counsel*, not Winston's expert, was ineffective for failing to identify the foregoing errors in the DNA analysis and that the Supreme Court of Virginia ignored that fact. This court finds Winston's view of the state court's decision to be myopic. Clearly, whatever level of professional competence might be demanded of capital defense counsel, they are entitled to rely on the advice of recognized experts in the field of forensic science in identifying deficiencies in the collection, analysis, and comparison of DNA. Winston has pointed to nothing in the record suggesting that his expert identified material deficiencies in the DNA evidence that Winston's counsel failed to exploit. Under the circumstances, therefore, the Supreme Court of Virginia's adjudication did not involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, the court denies Winston's ineffective assistance claim both as a freestanding claim and as excuse for his procedural default. Therefore, the procedurally defaulted DNA-related claims are not excused and cannot be considered by the court. (claims II(D)(2)-(3)).

## VI. Claims That the Commonwealth Knowingly Presented False Testimony and Created False Impressions
## (Winston's Claims III(A) - III(E))

Winston alleges seven instances of prosecutorial misconduct in which the Commonwealth knowingly presented false testimony or created false impressions either before

19

the grand jury that indicted him or the petit jury that tried him. Alternatively, Winston alleges that his counsel was ineffective in failing to investigate and raise these alleged instances of misconduct at trial. On state habeas review, the Supreme Court of Virginia found that Winston procedurally defaulted all but one of the prosecutorial misconduct claims, and that the undefaulted prosecutorial misconduct claim and the ineffective assistance claim lacked merit. Winston raises a number of arguments to defeat procedural default; the court rejects all of these arguments. As to his single undefaulted claim, this court finds that it was not unreasonable for the Supreme Court of Virginia to deny it. Therefore, this court finds that the Supreme Court of Virginia did not apply clearly established federal law in an objectively unreasonable manner or unreasonably determine the facts as to these claims. (claims III(A)-III(E)).

A. Procedurally Defaulted Due Process Claims (Winston's Claims III(A), III(B), III(D), III(E))

In his first procedurally defaulted claim, Winston alleges that Commonwealth knowingly presented false testimony from three witnesses[7] to the grand jury that indicted him. The witnesses testified that Winston admitted to committing the murders and that Tywan Turner was not a suspect. The Supreme Court of Virginia found this claim procedurally defaulted because Winston presented his claim in an untimely manner. Winston v. Warden, 2007 WL 678266, at *3 (citing Va. Code § 8.01-654.1 and § 8.01-654(B)(2) (2006)). The Supreme Court of Virginia found that § 8.01-654(B)(2) independently barred Winston's claim regarding the first grand jury witness. Winston does not challenge the application of this statute and the court therefore cannot

---

[7]The witnesses were: Marty Campbell, who was incarcerated with Winston at one time; Lynchburg investigator David Gearhardt; and Tron Terry, an associate of Winston's. This court considers each person's testimony as a separate instance of alleged prosecutorial misconduct.

20

consider the claim with regard to the first grand jury witness.[8]  Winston brought a claim

regarding the other two witnesses in a motion to amend which the Supreme Court of Virginia

denied.  This court therefore cannot consider any part of this claim.  (claim III(A)).

The Supreme Court of Virginia found Winston's next three procedurally defaulted

claims barred by Slayton.  Winston claims that the Commonwealth knowingly presented false

testimony regarding (1) when the Commonwealth learned of Rorls' purported phone

conversation with Winston, in which Winston allegedly made damaging admissions, (2) whether

Tywan Turner was in Lynchburg on the night of the murders, and (3) Rorls' testimony that

suggested Winston learned of Rhonda's pregnancy in the course of killing her.  Winston applies

the same four arguments to excuse or defeat these procedural defaults, but cannot.

The court first considers Winston's argument that his counsel's failure to discover the

factual basis of these claims serves as cause and prejudice to excuse the default.  The Supreme

Court of Virginia found that this claim failed to satisfy Strickland because Winston did not allege

prejudice with any particularity.  Because Winston's bare and conclusory assertion of a Sixth

Amendment violation cannot satisfy Strickland, it would not be unreasonable for the Supreme

Court of Virginia to conclude that Winston failed to show prejudice.  The court therefore finds

that the Supreme Court of Virginia did not unreasonably apply clearly established federal law and

that its decision was not based on an unreasonable determination of the facts.

Winston's next three arguments to defeat procedural default merit little attention.  First,

---

[8] Winston challenges the consistent application of § 8.01-654.1 by the Supreme Court of
Virginia.  However, because the Supreme Court of Virginia found that § 8.01-654(B)(2)
independently barred consideration of the same claim, this court finds it unnecessary to address
Winston's arguments.

Winston claims actual innocence, which the court fully considered and rejected above, *supra* IV. Second, Winston reasserts the argument he used on his defaulted DNA-related claims: <u>Slayton</u> is not consistently applied in this context. As explained above, *supra* V, <u>Slayton</u> is consistently applied to claims that could have been brought but were not, and so the court rejects this argument again. Third, Winston asserts as cause and prejudice that the Commonwealth's concealed the factual basis of these claims, but he goes no further to demonstrate it. A conclusory assertion that cause and prejudice exist is insufficient, and this court therefore rejects Winston's argument. <u>See, e.g.</u>, <u>Lundgren v. Mitchell</u>, 440 F.3d 754, 764 (6th Cir. 2006). Accordingly, the court finds that Winston's procedural defaults are not excused, and cannot consider Winston's procedurally defaulted claims regarding false testimony. (claims III(A), III(B), III(D), III(E)).

> B. <u>Undefaulted Due Process Claim Regarding Rorls' Plea Arrangement (Winston's Claim III(C))</u>

Winston argues that another knowingly false presentation by the Commonwealth occurred when it created the impression that it was not involved in any deal with Rorls but had actually assured him of a lenient sentence for implicating Winston. The Supreme Court of Virginia denied the claim on the merits noting that Winston knew of Rorls' ongoing plea negotiations.

The United States and Rorls' counsel filed several motions in Rorls' federal case to extend the time for indicting Rorls until after Rorls testified regarding Winston. At Winston's trial, Rorls testified he was facing "I think fourteen years." (App. 963.) However, on cross-examination Rorls testified "I'm facing twenty to twenty-five to life . . . but that – they worked a plea out with me." (App. 978.) Rorls now states in his affidavit that Lynchburg detectives

22

assured Rorls before trial they would "take real good care" of him. (App. 1118.) The fact that Rorls' sentence was shorter than anything he predicted at trial does not alter the fundamental facts the Commonwealth did disclose through Rorls: his testimony was given in exchange for a substantial and then-undetermined sentence reduction.

Because the Commonwealth presented testimony that made clear to the jury that Rorls' cooperation was part of a likely plea deal, the Supreme Court of Virginia could have reasonably concluded that no due process violation occurred. This court therefore finds that the Supreme Court of Virginia did not unreasonably apply clearly established federal law and did not unreasonably determine the facts. Accordingly, the court denies this claim. (claim III(C)).

### VII. Claims Relating to Extraneous Influences on the Jurors (Winston's Claims IV(A), IV(B), V(A), and V(B))

Winston claims he was denied his due process right to a fair trial when victims' families spoke to jurors and when the trial court and counsel examined those jurors about the matter while Winston was not present, and he claims his counsel was ineffective in failing to secure his presence and not moving for a mistrial. On state habeas review, the Supreme Court of Virginia found that Winston procedurally defaulted the due process claims and that the related ineffective assistance claims failed under both of Strickland's prongs. This court finds that the Supreme Court of Virginia's adjudication of Winston's ineffective assistance claims did not involve an unreasonable application of clearly established federal law or an unreasonable determination of facts and that nothing excuses the procedural default of Winston's intertwined due process claims. Accordingly, the court dismisses the claims.

During Winston's trial, four jurors came in contact with members of the victims' families

while the court was in recess. (J.A. 2412-13.) The family members made comments encouraging the jurors to convict and the jurors mentioned this interaction to the bailiff, who then called it to the trial court's attention. Id. The trial court then determined which jurors were contacted and questioned them on the record in the presence of counsel but not Winston. (J.A. 2412-27.) The trial court gave counsel an opportunity to question the jurors as well. Id. Immediately following, Winston's counsel discussed the questioning with Winston and, with Winston's consent, made a tactical decision not to move for a mistrial because counsel believed that some jurors were sympathetic, that Winston would likely not get such a sympathetic jury again, and that "the trial was leaning [Winston's] way." (App. 791.) Nevertheless, following the adverse verdict, Winston moved for a mistrial based on the contact jurors had with the victims' families. In the post-trial hearing on the motion, the trial court found that there was not any "prejudice or harm to Mr. Winston as a result" of jury contact, and it noted that it was "satisfied with the jurors' answers at the time [of questioning]." (J.A. 3425.) Consequently, the trial court denied Winston's motion. Id.

On direct appeal, Winston raised the trial court's failure to grant a mistrial, and the Supreme Court of Virginia rejected the claim under Rule 5:25 of the Rules of the Supreme Court of Virginia on the ground that Winston expressly declined to move for mistrial at the time the alleged error was committed and decided instead to go forward with the trial.[9] On state habeas, the Supreme Court of Virginia found Winston's due process claims procedurally defaulted as non-jurisdictional issues that Winston failed to preserve in the trial court. Winston v. Warden,

---

[9]Rule 5:25 of the Rules of the Supreme Court of Virginia provides that the Supreme Court of Virginia will not sustain error to any ruling by the trial court unless "the objection was stated with reasonable certainty at the time of the ruling . . . ."

24

2007 WL 678266, at *6-7 (citing <u>Slayton</u>, 205 S.E.2d at 682).

Winston raised two related ineffective assistance claims in his state habeas petition, claims he also raises here. First, he claimed that counsel was ineffective in failing to secure his presence during the trial court's examination of the jurors. He argued that had he witnessed the reactions of the jurors, he would not have agreed to forego a mistrial motion and the trial court likely would have granted that motion. Second, he claimed that counsel was ineffective in failing to move immediately for a mistrial. As to both claims, the Supreme Court of Virginia held that Winston failed to satisfy either of <u>Strickland</u>'s two prongs. As to the prejudice prong, the state court rejected the premise, implicit in both claims, that there was a reasonable probability that the trial court would have granted a motion for mistrial. Therefore, it concluded that there was not a reasonable probability that but for counsel's allegedly deficient performance, the result of the proceeding would have been different.

Winston points to nothing that shows that the trial court would have granted a mistrial had counsel made the motion earlier, given its expressed satisfaction with the jurors' answers. Therefore, this court finds that the Supreme Court of Virginia did not apply <u>Strickland</u> in an objectively unreasonable manner or unreasonably determine the facts in deciding Winston's ineffective assistance claims, and because those claims lack merit, they cannot excuse the procedural default of the substantively related claims.[10] Accordingly, the court denies the claims. (claims IV(A), IV(B), V(A), and V(B)).

_____

[10]Winston does not expressly assert that these <u>Strickland</u> claims excuse the procedural default of the related substantive claims. The court assumes this is an oversight.

25

## VIII. Claims That Winston's Counsel Failed to Investigate and Present Evidence at the Guilt Phase of Trial
### (Winston's Claims VI(A)(1) - VI(A)(7), VI(B) - VI(B)(3), and VI(C)(1) - VI(C)(3))

Winston claims that his counsel unreasonably failed in numerous ways to investigate and present relevant and compelling evidence at the guilt/innocence phase of Winston's trial. He raises each of these numerous instances as a separate ineffective assistance claim entitling him to habeas relief. These claims fall into three groups, each focused on one individual: Rorls, the key prosecution witness and an associate of Winston's; Tywan Turner, the associate of Winston's who Winston's counsel argued was the actual triggerman; and Niesha, Rhonda's daughter, who witnessed her mother's death. Winston presented all of these claims on state habeas review, except one, and the Supreme Court of Virginia rejected them, finding neither deficient performance nor prejudice. The ineffective assistance claims fail here because the Supreme Court of Virginia could have reasonably concluded that Winston's counsel did take the critical steps that are at the core of these claims: vigorously cross-examining Rorls, introducing evidence of Tywan Turner's involvement, and tactically relying on Niesha's testimony rather than discrediting it.[11] This court, therefore, concludes that the Supreme Court of Virginia's adjudication of these claims did not involve an unreasonable application of clearly established federal law or an unreasonable determination of facts. Accordingly, the court dismisses them. The one ineffective assistance claim not presented to the state court is procedurally defaulted in

---

[11]This court focuses on deficient performance. However, as to prejudice, the court notes that even if counsel had not committed any of the professional errors alleged, these irreducible facts would still remain: (1) two or more persons were intruders in the Robinsons' home in the early morning hours of April 19, 2002; (2) Winston was one of these intruders; (3) in the course of that intrusion, Rhonda and Anthony were brutally murdered; (4) they were murdered with Winston's 9-millimeter pistol; and (5) after the murder, Winston gave that pistol to Robin Wilson for safekeeping.

this court and, therefore, the court dismisses it.

A. Claims Related to Rorls' Testimony (Winston's Claims VI(A)(1)-(7))

Winston presents seven ineffective assistance claims regarding Rorls' testimony, arguing that his counsel did not sufficiently attack Rorls' credibility, either through cross-examination or through introduction of other evidence. Winston argues that his counsel should have (1) questioned Rorls more aggressively on the timing of the phone call he testified he received from Winston wherein Winston admitted to the murders; (2) made use of Rorls' statement that Winston left a gun in the Robinsons' home even though the police found the 9-millimeter murder weapon elsewhere; (3) questioned Rorls on why he waited six months, until he faced federal drug charges, to alert the Commonwealth to Winston's admission; (4 and 5) interviewed two witnesses who were present when Rorls met Winston in Woodbridge but who did not hear Winston confess; (6) emphasize a plea deal Rorls received in a federal case for his cooperation; and (7) objected to Rorls' testimony that Winston knew that Rhonda was pregnant, implying that it was inside information that could only have come from Winston. However, these claims distill to one contention: Winston's counsel should have further emphasized that Rorls lied about Winston's admissions in order to reduce Rorls' own prison time. The Supreme Court of Virginia found that Winston failed to show deficient performance and prejudice and denied these claims. This court finds the state court's adjudication was not unreasonable because Winston's counsel thoroughly attacked Rorls' credibility.

On cross-examination, Winston's counsel elicited inconsistencies in the timing of Winston's alleged phone-call admission and then raised it again in closing argument. (J.A. 2793.) The jury clearly and repeatedly heard that Rorls' cooperation was part of an expected plea

27

deal, not of his own volition and timing, but a function of his own criminal charges. (App. 963, 979, 1018-19, 1029.) Winston's counsel also established that Rorls could have learned of Rhonda's pregnancy from a source other than Winston even though Rorls claimed that Winston revealed the pregnancy to him when he admitted to the murders. (App. 999.)

In light of counsel's vigorous cross-examination of Rorls, it would not be unreasonable for the Supreme Court of Virginia to conclude that Winston failed to show deficient performance in his counsel's failure to further discredit Rorls. Therefore, this court finds that the Supreme Court of Virginia did not apply <u>Strickland</u> in an objectively unreasonable manner or unreasonably determine the facts as to these claims. Accordingly, this court denies Winston's ineffective claims related to Rorls' testimony. (claims VI(A)(1)-(7)).

B. <u>Claims Related to the Defense Theory of Tywan Turner's Guilt (Winston's Claims VI(B) and VI(B)(1)-(3))</u>

Winston faults his counsel for four alleged failures to more fully develop the theory that Tywan Turner committed the murders. Winston claims his counsel was ineffective because they (1) failed to offer more evidence that Turner had a motive to kill Anthony, (2) decided not to call Patty Whitehead ("Patty"), Rhonda's sister, to establish that Turner was in Lynchburg at the time of the murders, (3) failed to ask witness Angela Whitehead ("Angela"), Rhonda's sister, more about Turner's drug involvement, and (4) failed to question Investigator Gearhardt about Turner's motive, alibi, and physical description. The Supreme Court of Virginia found that none of these claims satisfied <u>Strickland</u>'s two prongs. That adjudication is not unreasonable because there is little to no evidence that Turner killed Rhonda and Anthony.

Winston's counsel did offer evidence to support the Turner theory, including aspects of motive and identity. Winston's counsel established that Turner supplied guns in Lynchburg,

28

supplied cocaine to Anthony, and that Turner was worried that Anthony would "squeal" on Turner. (App. 984-85.) Winston's counsel also showed that Turner was a 6-foot, 2-inch, 205-pound black male who fit Niesha's general description of the shooter. (J.A. 2686.) Winston's counsel subpoenaed Patty but made a tactical decision not to call her because they were "unsure what she would say." (App. 338.) On the stand Angela refused to admit she told police that she saw Turner with a 9-millimeter pistol, but counsel later established that Angela had made such a statement through another witness. (App. 1015-16, J.A. 2658-59.)

Winston presents no compelling evidence which his counsel failed to present at trial that Turner fired the fatal shots. Therefore, the Supreme Court of Virginia could have reasonably concluded that Winston did not show deficient performance because further circumstantial evidence of Turner's presence would have been cumulative. The court finds that the Supreme Court of Virginia did not apply Strickland in an objectively unreasonable manner or unreasonably determine the facts. Accordingly, this court denies Winston's ineffective assistance claims regarding Turner. (claims VI(B) and VI(B)(1)-(3)).

C. Claims Related to Niesha's Testimony (Winston's Claims VI(C)(1)-(2))

Winston argues his counsel should have done more to show that Patty, Rhonda's sister, manipulated Niesha's recollections of the murders. Winston argues his counsel should have argued that Niesha's key testimony, that she saw a tattoo of "a big dog" on the shooter, (App. 930), was not true but was planted in her mind by Patty in order to protect Turner, the father of Patty's children. The Supreme Court of Virginia found that these claims failed under Strickland. That adjudication is not unreasonable because Winston's counsel made a tactical decision to rely on favorable evidence from Niesha that could have indicated that Winston was not the shooter.

29

Niesha, who was nine years old when she testified, offered the only eyewitness account of the death of her mother, Rhonda. Niesha consistently testified that, of the two intruders in her home that night, the man wearing "all black" was the shooter. (App. 927, 936.) Winston's counsel led Niesha to agree that the other intruder wore a white-striped sweatshirt that night; that man was not the shooter, and actually attempted to stop the shooter from killing Niesha's mother. (App. 935-36.) Counsel then exploited physical evidence that Winston was wearing striped, not all-black, clothing that night – Tranika Turner, Winston's girlfriend, testified that Winston wore a striped sweatshirt when she picked him up near the Robinson home shortly after the murders, and the sweatshirt itself was introduced into evidence. (J.A. 2782-85.) Winston's counsel used Niesha's testimony and the sweatshirt itself to support the inference that Winston was not the shooter and actually tried to stop the man in "all black" from shooting Rhonda. Therefore, the very tactic that Winston incongruously now disparages to support his ineffective assistance claims produced evidence from Niesha that Winston relies on in his "actual innocence" claim as "undisputed evidence that Winston is not guilty of capital murder." (Pet. 15.)

It follows that the Supreme Court of Virginia could have reasonably concluded that Winston failed to show either deficient performance or prejudice. Consequently, its adjudication of the claims relating to Niesha did not result in a decision that was contrary to clearly established federal law or was based on an unreasonable determination of the facts. Accordingly, this court dismisses the claims. (claims VI(C)(1)-(2)).

### D. Procecurally Defaulted Ineffective Assistance Claim Regarding Niesha's Testimony (Winston's Claim VI(C)(3))

Winston claims that the trial court improperly allowed Niesha to testify regarding the tattoo she said she saw on "Mr. No Name" because of her repeated exposure to photographs of

that tattoo. Winston now faults his counsel for failing to object to the admission of Niesha's description of the tattoo on the grounds that the photographs too deeply influenced her. Winston did not preserve the evidentiary claim for direct appeal and did not raise the ineffective assistance claim in his state habeas petition. (Pet. 101.) The claim is therefore procedurally barred because it was never presented to the state court, and, under <u>Slayton,</u> it cannot now be presented to the state court. <u>Teague v. Lane,</u> 489 U.S. 288, 297-99 (1989); <u>Clagett v. Angelone,</u> 209 F.3d 370, 378 (2000) ("If claims were not exhausted in state court but would now be procedurally barred if brought in state court, then federal courts can treat the claims as if they were procedurally defaulted in the state courts.") (citing <u>Coleman v. Thompson,</u> 501 U.S. 722 (1991)). Winston asserts this court can review the claim *de novo* because Winston is actually innocent. Because this court has determined that Winston is not actually innocent, *supra* IV, this court cannot review this exhausted but procedurally defaulted claim. (claim VI(C)(3)).

## IX. Claim Related to Evidence of Rhonda Whitehead's Pregnancy (Winston's Claim VII)

Winston claims that the Commonwealth violated his due process rights under the Fifth and Fourteenth Amendments when it introduced evidence of Rhonda's pregnancy. Winston made no constitutional claims regarding the pregnancy evidence to the Supreme Court of Virginia on direct appeal or in his state habeas petition. Therefore, Winston's claim is exhausted but procedurally defaulted, and this court cannot consider it.

Winston's direct appeal to the Supreme Court of Virginia presented three claims relating to evidence of Rhonda's pregnancy: (1) the trial court erred in allowing the prosecution to present physical evidence of the pregnancy; (2) the trial court erred when it allowed Rorls to

testify regarding the pregnancy; and (3) the trial court erred by allowing the medical examiner to testify regarding the pregnancy. Each of these claims was a complaint of inadmissibility under Virginia law; none of them was constitutionally based. (Appellant's Br. at 5, 8, 20-21, Winston v. Commonwealth, 604 S.E.2d 21 (Va. June 17, 2004).) The Supreme Court of Virginia addressed these claims together and found that the evidence was relevant for the purpose for which it was offered – bolstering witness credibility. The Supreme Court of Virginia considered these claims as state, not constitutional, claims.

Despite having failed to raise the admission of Rhonda's pregnancy as a federal constitutional issue on direct appeal, or for that matter even on state habeas review, Winston argues here that the evidence was so unduly prejudicial that it rendered his trial fundamentally unfair in violation of the Fourteenth Amendment. To be cognizable here, however, Winston must have fairly presented the claim to the Supreme Court of Virginia as a federal claim. See Baldwin v. Reese, 541 U.S. 27 (2004). He has not done so, and cannot do so now; the claim is exhausted but procedurally defaulted, and the court dismisses it. (claim VII).

### X. Claims Relating to Commonwealth's Allegedly Improper Closing Arguments at the Guilt Phase of Trial (Winston's Claims VIII(A) and VIII(B))

Winston claims that, during closing argument, the Commonwealth knowingly misstated facts and created false impressions regarding Niesha's testimony and DNA evidence in violation of his right to due process. Winston roots his claims in the principle that the prosecution may not knowingly create false impressions during closing argument. Berger v. United States, 295 U.S. 78, 89, 85 (1935) (finding that a prosecutor engaged in "pronounced and persistent" conduct that

32

was "calculated to mislead the jury"). The Supreme Court of Virginia found this claim procedurally defaulted, and this court cannot consider it unless Winston's related ineffective assistance claim provides cause and prejudice to excuse the default. Winston claims he received ineffective assistance because his counsel failed to object to the arguments. Because Winston points to nothing suggesting that the trial court would have, or for that matter should have, sustained such an objection, it was not unreasonable for the Supreme Court of Virginia to conclude that Winston failed to satisfy <u>Strickland</u>'s two prongs. Accordingly, the court dismisses both the due process and the ineffective assistance claims.

In its closing argument, the Commonwealth argued (1) that Winston was Niesha's "Mr. No Name," (2) that "we know from Niesha that the two men had guns," and (3) that Winston's DNA matched the DNA on the 9-millimeter murder weapon at every locus, including those that had "inconclusive" results. Winston claims the Commonwealth knowingly misled the jury because (1) Niesha's testimony also suggested that Winston was *not* "Mr. No Name," (2) Niesha mentioned only one gun, and (3) inconclusive DNA results do not "match" other inconclusive results.

<u>Berger</u> requires a showing of egregious misconduct. Here the Supreme Court of Virginia could have reasonably concluded that there was no misconduct at all, let alone egregious misconduct. Counsel may very well make arguments based on a misunderstanding of the facts; but juries understand that they determine the facts from the evidence, not from the arguments of counsel. Each of the challenges Winston now raises regarding the Commonwealth's closing argument would have been suitable grist for Winston's counsel during their closing argument but none of those challenges is grounds for a constitutional claim. Under the circumstances, it was

33

not unreasonable for the Supreme Court of Virginia to conclude that Winston had failed to show deficient performance or prejudice in counsel's failure to object. Therefore, the court dismisses Winston's due process and intertwined ineffective assistance claim. (claims VIII(A) and (B)).

## XI. Claim Relating to Jury Instructions on Lesser Included Offenses
## (Winston's Claim IX)

Winston claims that the trial court violated his "Eighth and Fourteenth Amendment rights to due process, to equal protection of the laws, and to be protected against cruel and unusual punishments" when it failed to instruct the jury on the lesser included noncapital offenses of first and second degree murder and accessory after the fact relating to the murder of Rhonda. (Pet. 115.) On direct appeal, the Supreme Court of Virginia concluded that there was not more than a "scintilla" of evidence to support those instructions and denied the claim. This court concludes that the Supreme Court of Virginia's denial of the claim on the merits did not involve an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, or an unreasonable determination of the facts. Accordingly, the court dismisses the claim.

In most instances in Virginia, a defendant is not guilty of a capital offense unless he is a principal in the first degree. Va. Code Ann. §§ 18.2-31, 18.2-18 (2006). Winston argues that there is evidence that he was not the triggerman and, therefore, not a principal in the first degree and guilty of capital murder. Under the circumstances, Winston claims he was constitutionally entitled to a lesser included noncapital offense instruction. In rejecting that claim on direct appeal, the Supreme Court of Virginia recounted evidence it described as "overwhelming evidence indicating that Winston was the triggerman responsible for Rhonda's death." Winston

34

v. Commonwealth, 604 S.E.2d at 44. The state court dismissed his argument that Niesha's testimony alone was sufficient to require the instruction. Essentially, on direct examination Niesha testified that the man who shot her mother had a tattoo of a "big dog" and wore "all black." There is evidence that Winston had a tattoo on his arm that resembled a "big dog." On cross-examination Niesha testified that the other intruder in her house wore white stripes and that he attempted to stop the man wearing "all black" from shooting her mother. She also testified that the man with a white stripes was the man with the tattoo. There is evidence that Winston wore a black sweatshirt with gray stripes. Neither side made an effort to clarify the matter further. Thus, Niesha's testimony, from the printed record, might be seen as conflicting on the question of clothing, which, in turn, points inconsistently first to Winston as the intruder who shot her mother and then to Winston as the intruder who attempted to stop the shooter. The Supreme Court of Virginia viewed the possible conflict on the clothing in the context of the overall record to be insufficient to merit a lesser included offense instruction noting that it had "repeatedly held that jury instructions on lesser included offenses are proper only when there is sufficient evidence to support them." Winston v. Commonwealth, 604 S.E.2d at 44. According to the state court, the evidence must amount to more than a scintilla, and there was "not more than a scintilla of evidence" that Winston was not the triggerman. Here, to support his claim that he was constitutionally entitled to the lesser included offense instructions, Winston relies on a synthesis of Keeble v. United States, 412 U.S. 205 (1973), which requires federal courts to give lesser included offense instructions in certain circumstances, and Beck v. Alabama, 447 U.S. 625 (1980), which requires all courts to give lesser included offense instructions in capital cases in certain circumstances. The court finds Winston's reliance under the circumstances here is

misplaced.

In Keeble the Supreme Court held that a federal defendant, in that case a noncapital defendant, was entitled to an instruction on a lesser included offense "if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Keeble, 412 U.S. at 208. Its rationale for requiring the lesser included offense instruction was based on its perception that "where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction." Keeble, 412 U.S. at 212-13. The Supreme Court grounded its decision on the Federal Rules of Criminal Procedure, not on any constitutional requirement. Under the law in this circuit, federal trial courts must give a lesser included offense instruction if the "conclusion as to the lesser offense fairly may be inferred from the evidence presented." United States v. Baker, 985 F.2d 1248, 1259 (4th Cir. 1993) (citing United States v. Medina, 755 F.2d 1269, 1273 (7th Cir. 1985)). However, this circuit has never recognized the rule as a constitutional requirement binding on the states and therefore controlling in a federal habeas proceeding under 28 U.S.C. § 2254 (2000).

In Beck, the petitioner was charged with capital murder. The trial court was statutorily prohibited from giving the jury the option of convicting the petitioner of a lesser included offense, a prohibition "unique in American criminal law." Beck, 447 U.S. at 635. "Instead, the jury [was] given the choice of either convicting the defendant of the capital crime, in which case it [was] required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime." Id. at 628-29. Based on the statute's blanket prohibition, the trial court denied petitioner a lesser included offense instruction although it was

36

otherwise supported by the evidence. The Supreme Court struck down the petitioner's resulting capital conviction and death sentence. It found that the blanket prohibition enhanced the risk of an unwarranted conviction because, when the evidence proves to the jury that the defendant committed a serious, violent offense, but not a capital offense, the jury may nevertheless hesitate to acquit and set a violent offender free. The Supreme Court noted that it had previously invalidated "procedural rules that tended to diminish the reliability of the sentencing determination" in death penalty cases, and found that reasoning equally applicable "to rules that diminish the reliability of the guilt determination" in those cases. Id. at 638. It follows, the Court concluded, that "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [the state] is constitutionally prohibited from withdrawing that option in a capital case." Id. at 638. It found that under the circumstances, because the evidence would have supported a lesser included noncapital offense, petitioner was entitled to a lesser included offense instruction as a matter of due process.

The court rejects Winston's argument that either of these cases or a synthesis from them compels this court to conclude that the Supreme Court of Virginia's adjudication of his claim involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. The Supreme Court has never indicated that Keeble embodies a constitutional principle that is applicable to the states. Therefore, it is not a source of clearly established federal law for purposes of federal habeas review. This leaves the Beck line of authority in the Supreme Court as the controlling precedent, and the Supreme Court has made clear in later cases that lower federal courts should not seek to extend Beck without regard to its "conceptual underpinnings." See Schad v. Arizona, 501 U.S. 624, 646 (1991).

In Schad, despite the fact that the jury was given the option of finding the petitioner guilty of a lesser included offense in a capital case, the petitioner contended that "the due process principles underlying Beck require[d] that the jury in a capital case be instructed on every lesser included noncapital offense supported by the evidence." Id. at 646. In rejecting that contention the Supreme Court stated:

> Petitioner misapprehends the conceptual underpinnings of Beck. Our fundamental concern in Beck was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for capital conviction if the only alternative was to set the defendant free with no punishment at all.

Id. at 647. It found that "this central concern of Beck simply [was] . . . not implicated . . . , for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence." Id. That is true here as well. Other charges on which the trial court instructed included: attempted robbery of Rhonda, using a pistol while attempting to commit that robbery, burglary while armed with a deadly weapon, and using a pistol while committing burglary. Therefore, like the jury in Schad, and unlike the jury in Beck, Winston's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence. Consequently, it would not have been an unreasonable application of clearly established federal law for the Supreme Court of Virginia to reject Winston's Beck claim.

 In that regard, Slaughter v. Parker, 450 F.3d 224 (6th Cir. 2006), is instructive. In Slaughter, the trial court, similarly to the trial court here, instructed on capital murder and first-degree robbery but not on a lesser included homicide, and the Sixth Circuit rejected a Beck claim, reasoning:

> In Slaughter's case, the trial court instructed the jury on first-degree robbery as well as intentional murder. As in Schad, the jury was not faced with an all-or-nothing choice. Because the jury had the option to convict Slaughter of a lesser, though still violent, crime, we find that Beck is not implicated.

38

Id. at 237. Applying that same reasoning, the Supreme Court of Virginia could have reasonably concluded that the trial court's failure to give a lesser included noncapital homicide instruction did not implicate due process.

The court notes additionally that it also owes deference to the state court's determination that there was not sufficient evidence to justify a lesser included offense instruction:

> The decision of whether there is enough evidence to justify a lesser-included offense charge rests with the sound discretion of the trial judge. Further, where . . . highest court of a state has reviewed a defendant's request for a lesser included offense instruction and concluded that it is not warranted by the evidence elicited at trial, that conclusion is axiomatically correct, as a matter of state law. Accordingly, the circumstances that would induce a federal court to overturn the state court determination would need to be extraordinary, indeed. Because federal habeas corpus relief does not lie for errors of state law . . . our only question here is whether the [state] courts' finding that there was insufficient evidence to support a [lesser included offense] instruction was so wrong as to amount to a fundamental miscarriage of justice.

Bates v. Lee, 308 F.3d 411, 418 (4th Cir. 2002) (citations and internal quotes omitted). Therefore, the question for a federal habeas court of whether there was sufficient evidence to support a lesser included noncapital homicide instruction never reduces to the question of whether the federal habeas court would have felt constitutionally required to give the instruction had it been the trial court. Rather, the question is whether the state court's finding that there was insufficient evidence to support the instruction was "so wrong as to amount to a fundamental miscarriage of justice." Id. The application of any other rule to this highly fact-laden inquiry effectively would transform federal habeas review to direct review.

Reviewing the Supreme Court of Virginia's adjudication of the claim through the AEDPA's deferential prism with the above precepts in mind, this court concludes that its adjudication was not an unreasonable application of clearly established federal law as determined

39

by the Supreme Court of the United States.  Accordingly, the court dismisses the claim.  (claim IX).

## XII.  Claims Based upon the Trial Court's Failure to Appoint a Mitigation Specialist (Winston's Claim X(A))

Winston claims that he was denied due process and equal protection of the law when the trial court denied his request for a mitigation expert.  Winston argues that the Constitution required the trial court to appoint such an expert, citing Britt v. North Carolina, 404 U.S. 226 (1971), Ake v. Oklahoma, 470 U.S. 68 (1985), and other cases.  The Supreme Court of Virginia denied this claim on direct appeal finding that Winston suffered no harm because the previously appointed defense investigator provided all the mitigation services Winston requested.  Winston v. Commonwealth, 604 S.E.2d at 30-31.

In Britt, the Supreme Court of the United States recognized that the government must provide indigent defendants with the "basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners."  404 U.S. at 227.  In Ake, the Supreme Court focused on competent psychiatric assistance but reaffirmed the principle that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense."  470 U.S. at 77.  Thus, the Supreme Court has made clear that each indigent defendant must be afforded the basic tools of an adequate defense, not that a mitigation expert is a per se requirement of every capital case.

Here, Winston's counsel requested a mitigation expert only as an assistant in finding and presenting mitigation evidence.  (App. 1095.)  The trial court had already appointed Winston a

40

defense investigator, in addition to other experts, to assist Winston. The trial court expressly expanded "the scope of what [Winston's] investigator [could] do to include background investigation for evidence in mitigation." (App. 1098.) The trial court denied Winston's request for a mitigation specialist, implicitly concluding that a defense investigator with this expanded scope of duties could adequately meet Winston's need for investigation into mitigating circumstances.

Given the tools that the trial court provided Winston, it would not be unreasonable for the Supreme Court of Virginia to conclude that the trial court's decision that Winston's mitigation needs were fulfilled did not breach any constitutional standard. Therefore, this court finds that the Supreme Court of Virginia did not apply federal law in an objectively unreasonable manner or unreasonably determine the facts as to this claim. Accordingly, the court denies Winston's claim regarding a mitigation specialist. (claim X(A)).

### XIII. Claim of Ineffective Assistance Regarding Sub-average Intellectual Functioning (Winston's Claim XI(D))

Winston contends that trial counsel unreasonably failed to present evidence about Winston's sub-average intellectual functioning. The Supreme Court of Virginia held that the claim met neither of <u>Strickland</u>'s two prongs. This court concludes that the Supreme Court of Virginia's decision that Winston failed to demonstrate prejudice was neither contrary to nor involved an unreasonable application of <u>Strickland</u>. Accordingly, the court denies the claim on that ground without reaching the application of <u>Strickland</u>'s deficient performance prong.

At sentencing Winston called a Fairfax Family Services worker who authenticated four psychological reports, which included the three psychological evaluations detailing Winston's

41

intellectual functioning and the results of his 1987, 1990, and 1995 IQ tests. According to Winston's state habeas petition, "counsel could have presented this evidence to the jury through the testimony of Winston's teachers and other school staff members, his social workers, his family members, and authors of various evaluations, reports, and assessments generated during his childhood and adolescence." (Initial Pet. 43, Winston v. Warden, 2007 WL 678266 (Jan. 27, 2006).) In rejecting the claim, the Supreme Court of Virginia noted that the introduced reports chronicled Winston's intellectual functioning as well as his "many emotional concerns resulting from his abandonment" by his family. Winston v. Warden, 2007 WL 678266, at *15. According to the state court, Winston failed to identify "the substance of any additional evidence he contends counsel should have presented" and failed to explain how that additional evidence would not have been cumulative and how it would have "affected the proceedings." Id. Therefore, the state court concluded that Winston "failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different." Id.

This claim implicates the weighing process. Under Virginia law if the jury cannot agree on whether to impose life or death sentence, the court dismisses the jury and imposes a life sentence. Va. Code Ann. § 19.2-264.4(E) (2006). Therefore, the prejudice inquiry distills to whether there is a reasonable probability that, but for counsel's deficient performance, at least one jury member would have found the mitigating circumstances to outweigh the aggravating circumstances. See Bowie v. Branker, 512 F.3d 112 (4th Cir. 2008). "In making this determination, [the reviewing court] must 're-weigh the evidence in aggravation against the totality of that available mitigating evidence.'" Bowie, 512 F.3d at 120 (quoting Wiggins v.

42

<u>Smith</u>, 539 U.S. 510, 534 (2003)).

Here, Winston's claim focuses on the *manner* in which counsel chose to present evidence of Winston's intellectual functioning rather than on counsel's failure to present that evidence. Counsel introduced without emphasis records chronicling Winston's low-level intellectual functioning. He neither had the authenticating witness read from them, nor did he highlight their significance in closing argument. Nevertheless, the jury had them, and this court cannot presume that the jury did not conscientiously review them or understand from them that Winston had, for example, a "borderline intellect and severe verbal processing problems" or that he was "at risk" of being easily manipulated. (App. 14.) Under the circumstances, this court cannot conclude that the Supreme Court of Virginia's decision, that Winston failed to show prejudice, was contrary to or involved an unreasonable application of <u>Strickland</u>. Accordingly, the court denies Winston's claim regarding subaverage intellectual function. (claim XI(D)).

### XIV. Claim of Ineffective Assistance Regarding Available Mitigation Evidence (Winston's Claim X(B))

Winston claims his counsel unreasonably failed to present available mitigating evidence from Winston's unstable and crime-ridden childhood. The Supreme Court of Virginia found that Winston failed to explain how additional evidence would not have been cumulative and, thus, concluded that this claim failed <u>Strickland</u>.

Counsel called five witnesses to illustrate Winston's difficult childhood. A Lynchburg corrections officer testified to Winston's good behavior while incarcerated in 2002. Connie Winston, Winston's mother, testified that, when her son was only six years old, he was present when she shot a clerk while robbing a bridal store. She also testified that she drank alcohol and

43

used PCP, marijuana, and cocaine while she was pregnant with Winston and after his birth. (J.A. 3000-01.) Mary Berrios, Winston's grandmother, testified that Winston lived in a number of different houses, including hers, as a child. (J.A. 3005.) She told the jury that Winston saw her stealing from stores when he was young. (J.A. 3006.) A foster care worker testified that social services placed Winston in numerous different homes during his time in their custody. Winston's counsel also introduced reports showing Winston's intellectual functioning as well as his "many emotional concerns resulting from his abandonment" by his family.

Because counsel introduced significant evidence of Winston's difficult childhood, it would not be unreasonable for the Supreme Court of Virginia to conclude that Winston did not show deficient performance. Therefore, the court finds that the Supreme Court of Virginia did not unreasonably apply Strickland or unreasonably determine the facts. Accordingly, this court denies Winston's ineffective assistance claim relating to mitigation evidence. (claim X(B)).

## XV. Atkins-Related Claims
### (Winston's Claims XI and XI(C))

Winston claims that the Eighth Amendment prohibits his execution because he is mentally retarded. Atkins v. Virginia, 536 U.S. 304 (2002). Winston did not raise this claim at trial or on appeal, and the claim is procedurally defaulted unless excused by his counsel's ineffective assistance. The court concludes that an evidentiary hearing is appropriate to determine whether counsel rendered ineffective assistance at sentencing both as a free-standing claim and as cause and prejudice to excuse procedural default of Winston's Atkins claim.

In 2002, the Supreme Court of the United States held in Atkins that the Eighth Amendment prohibits the execution of the mentally retarded, but it left to the states the task of

44

developing "appropriate ways" to enforce that restriction. Id. at 317. Virginia responded by enacting its definition of mental retardation and by requiring the defendant to "bear the burden of proving that he is mentally retarded by a preponderance of the evidence" at sentencing. Va. Code Ann. § 19.2-264.3:1.1 (2006). The statute requires that the capital defendant's disability originate before age 18, "characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills." Va. Code Ann. § 19.2-264.3:1.1A (2006). The Supreme Court of Virginia, consistent with the standards of the American Psychiatric Association, has determined that the "standardized measure" the Virginia statute requires corresponds to an IQ score of 70 or less. Johnson v. Commonwealth, 591 S.E.2d 47 (2004), vacated on other grounds, 544 U.S. 901 (2005).[12] However, "a habeas petitioner is not required to submit an IQ score of 70 or less from a test taken before he turned the age of eighteen." Hedrick v. True, 443 F.3d 342, 367 n.2 (2006) (citing Walker v. True, 399 F.3d 315 (4th Cir. 2005)). Rather, he must prove "that his intellectual functioning would have fallen below the standard before he turned the age of eighteen." Id.

B. Leigh Drewry, Jr., one of two court-appointed lawyers assigned to represent Winston at trial, "accepted responsibility for gathering the mitigation evidence in the case." (App. 337.) In carrying out that responsibility Drewry obtained Winston's "high school records, social

---

[12]Of course, the operative language of the Virginia statute is "two standard deviations below the mean." An IQ score of 70 would only correspond to two standard deviations below the mean on a properly normed test. See Walker v. True, 399 F.3d 315, 322 (4th Cir. 2005).

45

service records, and hospital records." (App. 338.) At least three psychological evaluations were included among those records. (App. 1-2, 3-6, 11-15.) An intelligence test was administered in connection with each evaluation.

The first intelligence test, the Wechsler Intelligence Scale for Children-Revised (WISC-R), was administered in 1987 when Winston was seven years old. According to the psychological evaluation report, Winston's verbal IQ score was 91, his performance IQ score 67, and his full scale IQ score 77. (App. 1.) At that time he was judged to be in the "mentally deficient to average intelligence" range. (App. 2.) The second intelligence test, another WISC-R, was administered in 1990, when Winston was ten years old. (App. 3.) Winston's verbal IQ score had fallen dramatically to 74. His performance IQ score was 75 and his full IQ score 73. (App. 4.) The evaluating psychologist for this test noted that Winston was functioning in the "borderline range of general intellectual ability." (App. 4.) She believed, however, that the test results likely represented an "underestimate" of Winston's abilities. (App. 4.) The psychologist also wrote, "[Winston's] ability to recall specific verbal facts which are typically acquired through education and experience is extremely deficient and falls within the Mentally Retarded range (1st percentile)." (App. 5.) The third intelligence test, the Wechsler Intelligence Scale for Children-III, was administered in 1995 when Winston was fifteen years old. His verbal IQ score was 60, his performance IQ score 75, and his full scale IQ score 76. The precipitous decline in Winston's verbal IQ score suggested to the evaluating clinical psychologist a "neurological insult." (App. 14.) The clinical psychologist for the third test believed Winston had "borderline intellect and severe verbal processing problems." (App. 14.) She noted that Winston "is both very immature and very passive. This combination of factors places him at a risk to be easily

46

manipulated by others. He is likely to always follow the easiest path, the strongest leader. He is not likely to initiate activity, either good or bad, on his own." (App. 14-15.)

Winston's school records also include a determination that Winston is mildly mentally retarded. In early 1997, a Fairfax County public school committee that included a social worker and psychologist found Winston eligible for special education due to "mild retardation." (App. 69.) According to the committee's findings, Winston "demonstrates a reduced rate of intellectual development and a level of academic achievement below that of age peers" and "concurrently demonstrates deficits in adaptive behavior." (App. 69.) Drewry, according to his own account in an affidavit filed both here and in the state habeas proceedings, however, did not notice or read that record. He did forward all the records to a consulting psychologist, Dr. Evan Nelson, who told Drewry that he did not think they "could prove [Winston] was mentally retarded as defined by the Virginia statute." (App. 338-39.) Drewry claimed to be unable to review all the records on his own and "relied on Dr. Nelson to thoroughly review the records and tell [him] what [he] needed to know." (App. 338.) Drewry considered the oversight significant. In his words:

> If I had noticed this record before trial, I certainly would have pointed it out to Dr. Nelson and followed-up on this information. I would have challenged his conclusion regarding mental retardation, particularly because the school record indicates Leon [Winston] had adaptive deficits prior to age 18. This record would have been very valuable to us because it was documentation the *Commonwealth* diagnosed Leon [Winston] with mental retardation as a child.

(App. 338-339.)

In the state habeas proceeding, Winston maintained that he was retarded and that his counsel was ineffective in not properly investigating and raising his retardation at sentencing. Winston filed records and affidavits chronicling his low-level intellectual functioning before he was eighteen and pointed to concurrent, significant limitations in his adaptive behavior. Winston

47

also argued that in addition to considering the 1997 determination that he was mildly mentally retarded at that time, the literature demonstrates that a generally accepted standard error of measurement of plus or minus 5 points should be applied to Winston's 1987, 1990 and 1995 IQ tests, and the "Flynn Effect" taken into account. The Flynn Effect refers to the phenomenon discovered by researcher James R. Flynn of rising IQ test scores. Flynn posits that unless IQ tests are adjusted, the mean IQ score will rise over time. Because the mean rises, the number defining two standard deviations below the mean rises. A score of 70 is only two standard deviations below the mean when the mean is 100; this is the case on a properly adjusted test. As the Flynn Effect progresses over time and the mean rises, the maximum score defining retardation under the Virginia statute rises above a score of 70 on an IQ test that is not readjusted. See Walker v. True, 399 F.3d 315, 321-23 (4th Cir. 2005); Walton v. Johnson, 269 F. Supp.2d 692, 699 n.5 (W.D. Va. 2003). Taking standard error and the Flynn Effect into account, Winston contended, his full scale test result in 1987 was from 68 to 78, in 1990 from 63 to 73, and in 1995 from 69 to 79. Winston sought an evidentiary hearing on the claim and unsuccessfully sought funds to hire a psychologist or psychiatrist to help him develop it.

The Supreme Court of Virginia found that Winston's ineffective assistance claim did not satisfy Strickland. Winston v. Warden, 2007 WL 678266, at *15. The state court noted that it had "previously held that the maximum score for a classification of mental retardation is an IQ score of 70" and that Winston's full-scale scores were 77, 76, and 73. Id. It also discounted the finding that he was mildly mentally retarded for purposes of special-education eligibility because a candidate for special education may be considered mentally retarded even with an IQ score above 70. Id. It found that he had offered "no objective data in support of his claim of mental

48

retardation" and "no documentation that he was diagnosed as being mentally retarded before the age of 18 in accordance with the legal definition of mental retardation established by the legislature." Id. It concluded, therefore, that Winston failed to demonstrate that his counsel's performance was deficient or that there was a reasonable probability that but for counsel's alleged error, the result of the proceeding would have been different. Id.

Winston maintains that he is entitled to an evidentiary hearing in this court regarding his ineffective assistance claim as it relates to his Atkins claim. "A district court may not grant an evidentiary hearing to a habeas petitioner if the petitioner 'failed to develop the factual basis of a claim' in state court unless certain statutory requirements are satisfied." Fullwood v. Lee, 290 F.3d 663, 681 (4th Cir. 2002) (citing 28 U.S.C. § 2254(e)(2)). At a minimum, diligence ordinarily requires the petitioner to seek an evidentiary hearing in state court "in the manner prescribed by state law." Williams v. Taylor, 529 U.S. 420, 437 (2000). Conversely, "[a] petitioner who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in Townsend v. Sain, 372 U.S. 293, 313 (1963)." Conway v. Polk, 453 F.3d 567, 582 (4th Cir. 2006).[13] But even if the petitioner is not *entitled* to

_____

[13] The six Townsend factors are:
(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. Townsend, 372 U.S. at 313.

49

an evidentiary hearing, the district court retains discretion to grant one:

> Prior to the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, the decision to grant an evidentiary hearing was generally left to the sound discretion of district courts. [citations omitted] That basic rule has not changed.

Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). In exercising that discretion, however, a district court must be mindful that it must view the petitioner's claim through AEDPA's highly deferential statutory lens:

> Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.

Id. at 1940.[14]

With these precepts in mind, the court concludes: (1) Winston diligently pursued his habeas corpus claims that Atkins bars his execution and that he received ineffective assistance of counsel through the failure to investigate this claim; and (2) it is not wholly implausible that he could establish his claims even in light of AEDPA's deferential standards. In reaching that conclusion, however, the court does not decide that Winston is entitled to an evidentiary hearing, but rather exercises its discretion to grant that hearing. The court grants Winston a hearing on his counsel's ineffective assistance both as cause and prejudice to excuse the procedural default of his Atkins claim and as a free standing constitutional claim. (claims XI and XI(C)).

---

[14] "Congress prohibited federal courts from granting habeas relief unless a state court's adjudication of a claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' § 2254(d)(1), or the relevant state-court decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.' § 2254(d)(2)." Schriro, 127 S.Ct. at 1939.

50

### XVI. Claim That the Death Penalty in Virginia is Unconstitutional
### (Winston's Claim XII)

Winston claims that Virginia's death penalty violates the Eighth and Fourteenth Amendments because the death penalty is imposed in a random and arbitrary manner. Furman v. Georgia, 408 U.S. 238 (1972). This claim was never fairly presented to the Supreme Court of Virginia and is exhausted but procedurally defaulted. Therefore this court cannot consider it here.

Winston brought a claim on direct review that Virginia's death penalty is unconstitutional, but that claim bears no relation to the claim presented here. On direct review, Winston claimed that Virginia's methods of execution – electrocution and lethal injection – constitute cruel and unusual punishment, which the Supreme Court of Virginia rejected as previously decided. (Appellant's Br. at 49, Winston v. Commonwealth, 604 S.E.2d 21 (Va. June 17, 2004)); Winston v. Commonwealth, 604 S.E.2d at 30. Winston's claim on direct review as to execution *methods* is entirely distinct from his claim here that the state's decision-making process is unconstitutionally arbitrary and random under Furman. Therefore, this claim was not brought before the Supreme Court of Virginia. It is exhausted but procedurally defaulted and this court cannot consider it. (claim XII).[15]

---

[15]Winston began but then abandoned an effort to bring this claim on state habeas corpus review. Winston included the claim in an petition that violated the Supreme Court of Virginia's 50-page limit. A subsequent petition complied with the 50-page limit but did not include this claim. Winston later moved to amend the petition by adding the claim, but the state court denied his motion. (App. 1091.) Winston argues that since his claim was presented twice – in the oversized petition and in the motion to amend – his claim was "fairly presented" to the Virginia court and is therefore subject to *de novo* review in this court. O'Sullivan v. Boerckel, 526 U.S. 838, 849 (1999). However, Winston's failure to bring the claim on direct review means that the claim would be defaulted on state habeas review, even if he had properly included the claim in his state habeas petition. The arguments as to Winston's presentation of this claim on state

## XVII.  Claim Regarding the Cumulative Impact of Trial Counsel's Performance
### (Winston's Claim XIII)

Winston alleges that his individual claims of ineffective assistance of counsel, considered cumulatively, demonstrate that his trial counsel's overall performance and the resulting prejudice violate the Sixth Amendment.  The Supreme Court of Virginia held that Winston's claim of cumulative ineffective assistance was without merit because Winston failed to demonstrate prejudice resulting from each individual alleged error by counsel.

The Fourth Circuit holds that "an attorney's acts 'that are not unconstitutional individually cannot be added together to create a constitutional violation." Fisher v. Angelone, 163 F.3d 835, 853 (4th Cir. 1998) (quoting Wainwright v. Lockhart, 80 F.3d 1266, 1233 (8th Cir. 1996).  The Fisher court announced: "to the extent this court has not specifically stated that ineffective assistance of counsel claims . . . must be reviewed individually, rather than collectively, we do so now." Id. at 852.  Because Winston has not shown deficient performance or prejudice for any of his ineffective assistance claims, it would not be unreasonable for the Supreme Court of Virginia to find that those claims cannot accumulate to equal constitutional error.  Therefore, this court finds that Supreme Court of Virginia did not apply Strickland in an objectively unreasonable manner or unreasonably determine the facts as to this claim. Accordingly, the court denies relief on Winston's cumulative ineffective assistance claim.  (claim XIII).

---

habeas review are therefore immaterial to this court's ability to consider the claim.

52

## XVIII. Conclusion

For the foregoing reasons the court rejects all of Winston's claims except two interrelated claims: (1) the claim that because he is mentally retarded <u>Atkins v. Virginia</u> bars his execution, a claim that he procedurally defaulted because he failed to raise the claim at trial, and (2) the claim that his counsel was ineffective in relation to his <u>Atkins</u> claim, thereby excusing his procedural default. The court finds that an evidentiary hearing is appropriate to resolve these interrelated claims.

**ENTER:** This 30th day of May, 2008.

_____

UNITED STATES DISTRICT JUDGE

Case 7:07-cv-00364-SGW   Document 39   Filed 05/30/08   Page 53 of 53   Pageid#: 710