CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

MAR 0 6 2009

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| LEON JERMAIN WINSTON, | ) | |
| **Petitioner,** | ) | Civil Action No. 7:07cv00364 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LORETTA K. KELLY, Warden, | ) | **By: Samuel G. Wilson** |
| Sussex I State Prison, | ) | **United States District Judge** |
| Respondent. | ) | |

A jury in the Circuit Court for the City of Lynchburg, Virginia found Petitioner Leon

Jermain Winston guilty of three counts of capital murder and sentenced him to three death

sentences. After exhausting his state court remedies, Winston filed a habeas petition in this court

pursuant to 28 U.S.C. § 2254 claiming actual innocence and raising more than thirty other

claims. This court rejected all but two of these claims: the claim that because he is mentally

retarded, Atkins v. Virginia, 536 U.S. 304 (2002), bars his execution, and the claim that he

received ineffective assistance of counsel because his lawyers failed to prepare and present that

claim to the jury. Winston v. Kelly, No. 7:07cv-00364, 2008 WL 2234587, at *29 (W.D. Va.

May 30, 2008). The Supreme Court of Virginia rejected Winston's mental retardation claim

because he procedurally defaulted it, and rejected his related ineffective assistance claim because

Winston failed to show that counsel's performance was deficient and failed to show that he

suffered any resulting prejudice under Strickland v. Washington, 466 U.S. 668 (1984). Winston

v. Warden, No. 052501, — S.E.2d —, 2007 WL 678266, at *15-16 (Va. Mar. 7, 2007). This

court exercised its perceived discretion to hold an evidentiary hearing to resolve those

interrelated claims.

At that hearing, Winston presented new evidence, including an IQ score of 66 that he

received as part of a psychological exam in 1997. Since this new IQ score fundamentally alters Winston's ineffective assistance claim and he cannot account for his failure to present it to the Supreme Court of Virginia, this evidence renders that claim unexhausted and procedurally defaulted. The court therefore reviews the new evidence to determine whether Winston is "actually innocent of the death penalty" so as to excuse his procedural default, and concludes that he cannot make the stringent showing actual innocence requires. Accordingly, the court is constrained to consider Winston's ineffective assistance claim as it was fairly positioned before the Supreme Court of Virginia, not as he attempts to reposition it here. Examining Winston's claim in light of the record presented to the Supreme Court of Virginia, the court finds that the Supreme Court of Virginia's adjudication on the merits of Winston's ineffective assistance claim, at least as to Strickland's prejudice prong, was not unreasonable and finds nothing to excuse the procedural default of his Atkins claim. Accordingly, the court dismisses both claims and denies his petition for habeas corpus.

## I.

The United States Supreme Court held in Atkins that the Eighth Amendment prohibits the execution of the mentally retarded, but tasked the states with developing "appropriate ways" to enforce that restriction. 536 U.S. at 317. Virginia law defines mental retardation as

> a disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Va. Code Ann. § 19.2-264.3:1.1(A) (2006). Defendants bear the burden of proving mental

2

retardation by a preponderance of the evidence. <u>Id.</u> § 19.2-264.3:1.1(C).

The intellectual functioning prong is "demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean." <u>Id.</u> § 19.2-264.3:1.1(A). The Supreme Court of Virginia, consistent with the standards of the American Psychiatric Association, has determined a full-scale intelligence quotient ("IQ") score of 70 or less is the "standardized measure of intellectual functioning" that indicates mental retardation. <u>Johnson v. Commonwealth</u>, 591 S.E.2d 47, 59 (Va. 2004), <u>vacated on other grounds</u>, 544 U.S. 901 (2005). However, "a habeas petitioner is not required to submit an IQ score of 70 or less from a test taken before he turned the age of eighteen," but rather must prove only "that his intellectual functioning would have fallen below this standard before he turned the age of eighteen." <u>Hedrick v. True</u>, 443 F.3d 342, 367 n.2 (4th Cir. 2006). Virginia law requires adaptive behavior assessments to be "based on multiple sources . . . including clinical interview, psychological testing and educational, correctional and vocational records," and at least one standardized, generally accepted measure of adaptive functioning. Va. Code. Ann. § 19.2-264.3:1.1(B)(2).

In Winston's capital murder trial, B. Leigh Drewry, Jr., one of two court-appointed lawyers, "accepted responsibility for gathering the mitigation evidence." (App. 337.) In carrying out that responsibility Drewry obtained Winston's "high school records, social service records, and hospital records." (App. 338.) Those records included three psychological evaluations, each accompanied by an intelligence test. (App. 1-2, 3-6, 11-15.) Winston took the first of these intelligence tests, the Wechsler Intelligence Scale for Children-Revised (WISC-R), in 1987 at age seven and received a verbal IQ score of 91, a performance IQ score of 67, and a full-scale IQ

3

score of 77. (App. 1.) At that time he was judged to have "mentally deficient to average intelligence." (App. 2.) Winston took the WISC-R again in 1990 at age ten and received a verbal IQ score of 74, a performance IQ score of 75, and a full-scale IQ score of 73. (App. 3-4.) The evaluating psychologist noted that Winston was functioning in the "[b]orderline range of general intellectual ability," but believed that the test was an "underestimate" of Winston's abilities. (App. 4.) The psychologist also wrote, "[Winston's] ability to recall specific verbal facts which are typically acquired through education and experience is extremely deficient and falls within the Mentally Retarded range (1st percentile)." (App. 5.) Winston took the third intelligence test, the Wechsler Intelligence Scale for Children-III (WISC-III), in 1995 at age fifteen and received a verbal IQ score of 60, a performance IQ score of 89, and a full-scale IQ score of 76. (App. 11-13.) The evaluating clinical psychologist attributed the precipitous decline in Winston's verbal IQ score to a "neurological insult" and found that he had "borderline intellect and severe verbal processing problems." (App. 14.) She noted that Winston's immaturity and passiveness "place him at a risk to be easily manipulated by others. He is likely to always follow the easiest path, the strongest leader. He is not likely to initiate activity, either good or bad, on his own." (App. 14-15.)

According to other records Drewry received, on October 10, 1996, the local screening committee of the Fairfax County Department of Student Services and Special Education ("Special Education Department") issued a report that recommended an additional psychological evaluation for Winston. (Pet'r's Ex. D at 843.) Three months later, on February 5, 1997, a Special Education Department committee determined Winston was eligible for special education due to "mild retardation" and that Winston "demonstrate[d] a reduced rate of intellectual

4

development and a level of academic achievement below that of age peers" and "concurrently demonstrate[d] deficits in adaptive behavior." (App. 69.)

At sentencing, Drewry did not attempt to prove that Winston was mentally retarded and therefore not subject to execution under <u>Atkins</u>. Instead, he attempted to shift the burden of proof to the Commonwealth, arguing that the Commonwealth was required to prove Winston was eligible for the death penalty by showing that he was *not* mentally retarded. Transcript of Jury Trial Proceedings before The Honorable Mosby G. Perrow, III on June 13, 2003 at 30-31, App. VII at 2937-38, <u>Winston v. Commonwealth</u>, 604 S.E.2d 21 (Va. 2004) (Nos. 040686, 040687). The jury found Winston guilty of three counts of capital murder and imposed three death sentences. Winston's direct appeals were unsuccessful. <u>Winston v. Commonwealth</u>, 604 S.E.2d 21 (Va. 2004), <u>cert. denied</u>, 546 U.S. 850 (2005), <u>reh'g denied</u>, 546 U.S. 1056 (2005). Winston then challenged his conviction and death sentence in a state habeas corpus petition raising more than thirty claims, including the claim that, because he is mentally retarded, <u>Atkins</u> bars his execution, and that his counsel were ineffective because they failed to investigate and make this argument at sentencing.

According to Drewry's own account in an affidavit filed in the state habeas proceedings and later in this court, Drewry did not notice or read the records relating to Winston's 1997 classification as mildly retarded. Instead, he forwarded all the records to Dr. Evan Nelson, the clinical psychologist appointed to assist Winston in capital sentencing. Drewry claimed to have been unable to review all the records on his own and "relied on Dr. Nelson to thoroughly review the records and tell [him] what [he] needed to know." (App. 338.) Drewry considered his own failure to read these records significant. In his words:

5

If I had noticed this record before trial, I certainly would have pointed it out to Dr. Nelson and followed-up on this information. I would have challenged his conclusion regarding mental retardation, particularly because the school record indicates [Winston] had adaptive deficits prior to age 18. This record would have been very valuable to us because it was documentation the *Commonwealth* diagnosed [Winston] with mental retardation as a child.

(App. 338-39.) According to Drewry's affidavit, "Dr. Nelson told [Drewery] he did not think [Drewery and his co-counsel, Glenn Berger] could prove [Winston] was mentally retarded as defined by the Virginia statute."[1] (App. 338-39.)

In support of the state habeas petition, Winston also filed records and affidavits

---

[1]In his Capital Sentencing Evaluation on Motion of the Defense, Dr. Nelson noted that the issue of mental retardation would "naturally emerge" from the three IQ test scores known at that time. However, as he explained,

the diagnosis of Mental Retardation requires low IQ *and* deficits in adaptive functioning. Typically, these deficits are reported by family and caregivers; the standardized tests and procedures would not be fairly applied in this case for a variety of reasons. Even so, the undersigned interviewed multiple parent figures for this defendant and reviewed his school, court, and Department of Social Services records – and no sources ever described an overall pattern of deficits in adaptive functioning or slowness to reach developmental milestones. Nor did the defendant describe deficits: he ran a drug "business," managed his own finances, bought his own clothes, found places to live, knew how to drive and generally navigate, could do laundry but preferred to get others to do it for him, etc. What did become apparent were the many ways in which his personality development was damaged by his poor upbringing, and this was also the best explanation for the enormous variability in his IQ scores as charted above.

(Pet'r's Ex. H at 7-8.) Nelson also wrote that "Mr. Winston had a history of Borderline Intellectual Functioning as measured by repeated IQ testings, but his daily living skills or real-world survival were at least at that level." (Pet'r's Ex. H at 3.) Elsewhere in his report, Nelson noted that Winston "was able to summarize the gist of" an explanation of the purpose for Nelson's interview with him, and that "[t]he grades and testing from the available records documented academic failures and academic achievement well below his potential." (Pet'r's Ex. H at 2, 7.) Drewry did not call Dr. Nelson to testify at Winston's sentencing.

purportedly chronicling his low-level intellectual functioning before age eighteen as well as concurrent, significant limitations in his adaptive behavior. Jean Tansey, Fairfax County's current Special Education Eligibility Specialist, explained in an affidavit that the school's 1997 mild retardation classification was likely based on a psychologist's assessment of cognitive ability and adaptive skills, but that these assessments were now destroyed:

> [i]t was the usual practice to perform updated psychological testing as well as an adaptive skills measure before classifying a student with mild retardation. It would be very unusual to classify a student as mildly retarded without first administering both a test of cognitive ability and an adaptive skills assessment. There is usually a psychologist on the eligibility team who is responsible for conducting this assessment. There was a psychologist on Leon Winston's team by the name of Diana Schwartz. Before a child could be classified as mildly retarded, the eligibility team would have to rule out other potential causes of the student's poor performance, such as chaotic home life, auditory or visual deficits, interrupted schooling, or other socioeconomic factors.
>
> . . . .
>
> On [habeas counsel's] request, I have searched our files for standardized testing of Leon Winston that would have been done in conjunction with this eligibility determination, as well as raw data from any such testing, and for adaptive skills assessments that would have been done, but I have been unable to locate these materials. I have checked with our storage facility and they do not have these materials. Such materials are typically destroyed after five years, and I can only conclude that those materials have been destroyed in this case.

50-Page Prophylactic Petition for Writ of Habeas Corpus at 36, Winston, 2007 WL 678266 (quoting App. 32.) According to the Special Education Department's standard evaluation and eligibility criteria submitted with Tansey's affidavit, a child with an IQ above 70 could be considered mentally retarded for special education purposes because "[i]f all additional information is consistent with the [mental retardation] definition, a slightly higher IQ score may not be statistically significant." (App. 36.)

7

In addition to underscoring the 1997 determination that he was mildly retarded, Winston contended in his state habeas petition that when his 1987, 1990, and 1995 IQ scores were properly adjusted for both the Standard Error of Measurement (SEM)[2] and the Flynn effect,[3] the low range of his properly-adjusted, full-scale IQ score on each test falls below 70.[4]

Winston unsuccessfully sought an evidentiary hearing on his ineffective assistance claim and unsuccessfully sought funds to hire a psychologist or psychiatrist to help him prove that he is mentally retarded. The Supreme Court of Virginia rejected his Atkins claim because he procedurally defaulted it and rejected Winston's ineffective assistance claim because it did not satisfy Strickland. Winston v. Warden, 2007 WL 678266, at *15. The court noted that, in Virginia "the maximum score for a classification of mental retardation is an IQ score of 70,"

---

[2]In his petition before the Virginia Supreme Court, Winston simply indicated that the court should apply "the generally accepted standard error of measure[ment] of plus or minus five points" to his earned IQ scores. 50-Page Prophylactic Petition for Writ of Habeas Corpus at 36, Winston v. Warden, 2007 WL 678266.
   As Winston's expert explained at the evidentiary hearing in federal court, an individual's score on a single IQ test is not necessarily that person's true IQ, but rather indicates the range within which his or her true IQ would fall. The standard error of measurement is three to five points on either side of the individual's score on a single test, depending on the accuracy desired. A full-scale IQ score of 70 on a single test indicates a 68% probability that the test-taker's true IQ falls between 73 and 67, or a 90% probability that the test-taker's true score falls within 75 and 65.

[3]As Winston argued in the Virginia Supreme Court, "[t]he Flynn Effect recognizes the fact that particular versions of intelligence tests become less accurate estimators of IQ over time. In fact, for each year after a test is first introduced, Flynn's research showed that the test may overestimate the subject's actual IQ by 1/3 points or more." 50-Page Prophylactic Petition for Writ of Habeas Corpus at 35, Winston v. Warden, 2007 WL 678266.

[4]Winston contended that after adjusting for the SEM and the Flynn effect, his true full-scale IQ scores range from 68 to 78 on the 1987 test, 63 to 73 on 1990 test, and from 69 to 79 on the 1995 test. 50-Page Prophylactic Petition for Writ of Habeas Corpus at 36, Winston v. Warden, 2007 WL 678266.

8

while Winston's full-scale IQ scores were 77, 73, and 76. Id. The court discounted the Special Education Department's 1997 mild retardation classification because the Fairfax County schools could classify a student as mentally retarded even with an IQ score above 70. Id. Therefore, it found that Winston had offered "no objective data in support of his claim of mental retardation" and "no documentation that he was diagnosed as being mentally retarded before the age of 18 in accordance with the legal definition of mental retardation established by the legislature." Id. Accordingly, it concluded that Winston failed to demonstrate that his counsel's performance was deficient or that there was a reasonable probability that but for counsel's alleged error, the result of the proceeding would have been different. Id.

In this court, Winston maintained that he was entitled to an evidentiary hearing in connection with his federal habeas petition on his ineffective assistance claim as it relates to his Atkins claim. Because the court found it had discretion to hold an evidentiary hearing, see Schriro v. Landrigan, 127 S. Ct. 1933, 1939 (2007), and it exercised its discretion to grant that hearing, the court found it unnecessary to determine whether Winston was *entitled* to an evidentiary hearing. Winston v. Kelly, 2008 WL 2234587, at *28.

Both Drewry and Berger testified at the evidentiary hearing that they did not read every page of Winston's records before sending them to Dr. Nelson, and that they did not recall seeing any records referencing Winston's 1997 mild retardation classification during their representation. Both testified that if they had seen these records, they would have claimed that Winston was mentally retarded and not eligible for the death penalty under Atkins and that they had no strategic reason to not pursue such a defense. Dr. Nelson testified that though he likely saw the 1997 mild retardation classification in Winston's records, he could not be certain

9

because he could not recall seeing it and did not list it among the sources in his Capital Sentencing Evaluation. Nelson also testified that counsel did not provide him with information from certain teachers, social workers, and family members whose input would have been relevant in assessing adaptive functioning.[5]

Marilynn Schneider Lageman also testified at the evidentiary hearing. Lageman was a psychologist in the Fairfax County schools and a member of the Special Education Department committee that recommended the 1997 psychological evaluation. Winston's federal habeas counsel, who was also his state habeas counsel, first located Lageman on November 6, 2008 in Blanco, Texas, twenty-one months after the Supreme Court of Virginia dismissed Winston's state habeas petition and two weeks before this court's evidentiary hearing. Lageman testified that she had performed a psychological evaluation that led to Winston's 1997 mild retardation classification and that she had retrieved this psychological evaluation from a computer disk

---

[5]Two of the individuals mentioned testified at the evidentiary hearing. Denise King, Winston's teacher at the Leary School in Fairfax County for four years, testified that Winston had difficulty reading and following directions. When he was 12 years old, King estimated his reading skills were on a second grade level and his math skills were on a fourth grade level and that he generally had problems following directions. Kirsten Jackson, a close relative who lived with Winston for 10 years of their childhood, testified that as a child Winston once blew up the family's microwave, could not do his own laundry, failed to do assigned chores and take baths on his own initiative, did not understand his school work, and was teased by the other children in the family.

Dr. Nelson did not interview King or Jackson in preparing his Capital Sentencing Evaluation on Motion of the Defense. Nelson's evaluation was based on his interviews with Winston's mother, maternal grandmother, and other family members as well as his review of Winston's records in school, court, and social services. (Pet'r's Ex. H at 1-2.) With the new information presented on habeas review, Nelson acknowledged the possibility his opinion might have been different.

stored in her home.[6]

As a part of this evaluation, Lageman administered the WISC-III IQ test. On that test, Winston received a verbal IQ score of 60, and a performance IQ score of 77, and a full-scale IQ score of 66. Lageman's report noted that Winston "was cooperative and attempted all tasks presented" during the evaluation, but that his "verbal cognitive skill development falls within the mild range of mental retardation for his age" while "[n]onverbal areas of cognitive functioning are somewhat more developed." (Pet'r's Ex. F at 2-3.) Though another psychologist was on the committee that ultimately determined Winston was mildly retarded, Lageman noted that such determinations depended on diagnostic criteria, including "[c]ognitive delays . . . based on an IQ test with a score below 70, taking into consideration . . . standard error measurements," "[s]ocial and adaptive skills that also fell in the mild range of mental retardation," and "teacher narratives, parent comments, classroom behavior [and] any information that [the committee] could get regarding people's impressions of the student, to make sure all areas were pretty much falling below that level." (Tr. 5.) She testified that the committee "typically requested" a standardized adaptive skills test "when mental retardation was an area of possible concern."[7] (Tr. 9-10.)

_____

[6]Lageman found this psychological evaluation on a disk stored in a locked room of her home. Though the school kept official records, Lageman kept her disks in a desk drawer in her office when she worked for Fairfax County schools, and when she moved to Texas in 2007 she simply packed up those disks along with her other materials. Lageman acknowledged the school did not require her to keep copies of the record and it "could be possible, not likely" that the report saved on her disk did not reflect the final version of the psychological evaluation. (Tr. 38.) The Warden objected to the admission of this evaluation. The court overruled the objection and received the document without deciding "for what purpose and in what context it should be considered." (Tr. 15.)

[7]Christine Johnson, who worked in the Special Education Department and signed Winston's 1997 mild retardation classification, testified that the form indicates that the committee was unanimous in its determination that Winston was eligible for special education

11

Winston's mental retardation expert, Dr. Daniel Reschly, opined that "to a reasonable degree of psychological certainty," before he reached age 18, Winston was mentally retarded under Virginia law.  (Tr. 72-73.)  As to the intellectual functioning component, Dr. Reschly testified that, when considering both the Flynn effect and the SEM, the low range for Winston's 1987, 1990, and 1995 IQ test scores[8] are more than two standard deviations below the mean.[9]  Though Dr. Reschly described the Flynn effect as "controversial" and noted that "there is not a consensus" on its application, he named two psychological sources that do recommend applying it.[10]  (Tr. 79-81.)  He also noted variations in Winston's scores on IQ subtests, but could not explain them.[11]  Dr. Reschly opined "to a reasonable degree of psychological certainty" that

---

based on mild retardation.  She also stated that the committee would have assessed the student's adaptive behavior based on a standardized measure before making a mental retardation determination.

[8]Dr. Reschly prepared his report before Winston located the fourth IQ test with the full-scale score of 66.  Dr. Reschly did discuss the fourth test during his testimony at the hearing.

[9]Dr. Reschly also noted that, considering the Flynn effect alone, only Winston's 1990 IQ score is more than two standard deviations below the mean.

[10]Dr. Reschly noted that the task force of Division 33 of the American Psychological Association does "take into account the Flynn effect by adjusting the population mean or by subtracting points from IQ scores obtained with tests whose norms are out of date."  (Tr. 84-86.)  Further, he read passages from the 2007 user guide of the American Association of Mental Retardation's classification manual which acknowledges the existence of the Flynn effect and states "[i]n cases where tests with aging norms is [sic] used, a correction for the aging norms is warranted," and gives an example of how to adjust the population norm.  (Tr. 82.)

[11]Dr. Reschly testified that Winston's verbal IQ score of 60 indicates "that he is significantly impaired in the use of reasoning and judgment in coping with the environment, and in assuming responsibility for his own behavior," (Tr. 90) and he stated that the reports of Winston's receptive and expressive language abilities seemed inconsistent with the verbal IQ score of 91 obtained in 1987.  Reschly could not explain why Winston's verbal IQ had decreased from 91 to 60 while his performance IQ increased from 67 to 89 between 1987 and 1995.

12

Winston had conceptual, social, and practical adaptive deficits before age 18.[12] Dr. Reschly based these conclusions on, among other sources, his interviews with Winston, some of Winston's relatives, a former guardian, and a former teacher, and on his review of Winston's criminal file, school records, and Dr. Nelson's report.

The Warden's expert, Dr. Leigh Hagan, reached the opposite conclusion based on an interview with Winston and a review of Winston's educational and legal records. He opined "that the totality of the behavioral science evidence does not indicate the onset of [mental retardation] originating before the age of 18 years." (Resp. Ex. A at 34.) Dr. Hagan testified that there is a lack of consensus as to the cause of the Flynn effect, though the generally accepted practice is to account for the Flynn effect by renorming standardized tests or by "address[ing] it in narrative form, but not to subtract IQ points that the individual has earned." (Resp. Ex. A at 32.) He also noted that there is no basis in practice for using SEM to find that an individual's true IQ falls in the range below the earned score on a given IQ test because it was equally likely that the test-taker's true IQ could fall in the range above the earned score. Dr. Hagan noted the

---

[12]As evidence of conceptual adaptive deficits, Dr. Reschly noted that Winston received low scores on standardized testing for literacy and other basic skills while in school, performed poorly in reading and writing instructions, and had difficulty communicating. (Pet'r's Ex. A at 22-29.) As evidence of social adaptive deficits, Dr. Reschly noted Winston's perceived immaturity, passiveness, and desperation for peer acceptance. (Pet'r's Ex. A at 29-32.) As evidence of practical adaptive deficits, Dr. Reschly noted Winston's inadequate money handling skills, his dependence on others for transportation, and failure to hold down a traditional job. (Pet'r's Ex. A at 32-33.)

Dr. Reschly based his assessment of adaptive functioning partially on the Adaptive Behavior Assessment System Test (ABAS-II) administered to King and Kathy Hartka, Winston's Fairfax County guardian for three years, based on their memories of Winston's behavior. By giving the test to King and Hartka, Dr. Reschly intended to "gain the perceptions of [Winston's] adaptive behavior from two competent, knowledgeable adults." (Tr. 121.) However, Dr. Reschly himself noted that such retrospective assessments "have limited utility." (Tr. 121.)

13

"wide variability" in Winston's scores on individual subtests of the IQ test (Tr. 319-328), and noted that "[s]everal factors can suppress scores." (Resp. Ex. A at 32.) Finally, he concluded that Winston's limitations in adaptive behavior did not significantly impair his functioning.[13]

At the conclusion of the evidentiary hearing, the court asked habeas counsel whether Winston had failed to develop the record in his state habeas proceeding because the Supreme Court of Virginia did not have before it the evidence counsel obtained from Lageman and the score from the IQ test she administered in 1997. Counsel responded that the appropriate question was whether Winston had failed to exhaust, and stated that there was no such failure here because Winston had alleged that he "was classified as mentally retarded by the Fairfax County Schools . . . . that Fairfax County had conducted new IQ testing prior to reclassification . . . . [and] that Winston had received a qualifying score on that IQ test." (Tr. 405.) When asked whether they had sought a subpoena from the Supreme Court of Virginia to obtain the fourth IQ test, Winston's counsel conceded they had not because the Supreme Court of Virginia almost never granted evidentiary hearings and such a request would have been futile. (Tr. 408-09.)

_____

[13]Dr. Hagan concluded that Winston's conceptual adaptive deficits "did not significantly impair his capacity to adapt to the requirements of life" (Tr. 226.) because Winston's competence to stand trial, waive rights, or testify had never been challenged, Winston had engaged in self-advocacy by preparing a lie to cover for his driving without a license offense in other proceedings, and Winston understood and followed the subject-matter limitations of his interview with Hagan. (Resp. Ex. A at 20-22.) Dr. Hagan also concluded that Winston's social adaptive deficits "were not of an order of magnitude to impair his capacity to engage others in relationships of his choosing, to communicate his needs and interests and to anticipate how others might react to what he's presenting to them through words and behavior" because he found that Winston had wooed a girlfriend in Lynchburg who looked after his needs and had set up alliances in drug dealing. (Resp. Ex. A at 22-25.) Dr. Hagan also concluded that Winston's practical adaptive deficits "were not significantly substandard for his peer group and chosen lifestyle" because he found that Winston had held several jobs, knew how to use tools for cutting wood and building a cabin, and had learned to navigate in an unfamiliar city. (Resp. Ex. A at 25-30.)

14

Winston maintains that the evidence adduced at the evidentiary hearing proves that he is

mentally retarded and that <u>Atkins</u> bars his execution, or at a minimum, that there is a reasonable

probability that but for counsel's unprofessional errors, the jury would not have sentenced him to

death. Before addressing the merits of Winston's ineffective assistance claim, the court retraces

the legal principles, findings, and conclusions that led it to grant an evidentiary hearing.

Winston's petition is governed by 28 U.S.C. § 2254 and Chapter 154 of the Antiterrorism

and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. §§ 2261-66

("AEDPA"). The Supreme Court of Virginia's rejection on the merits of Winston's ineffective

assistance claim for failing to prepare and raise an <u>Atkins</u> claim is an adjudication of the merits.

<u>Bell v. Jarvis</u>, 236 F.3d 149, 163 (4th Cir. 2000). Under the AEDPA, federal courts reviewing

habeas petitions by state prisoners must defer to the merits decisions of state courts:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>       (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>       (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court adjudication is contrary to clearly established federal law "if

the state court arrives at a conclusion opposite to that reached by [the Supreme Court of the

United States] on a question of law or if the state court decides a case differently than the

[Supreme Court of the United States] has on a set of materially indistinguishable facts."

<u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 412-13 (2000). A state court decision unreasonably

15

applies clearly established federal law "if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts." Id. at 413. It is insufficient that a state court applied federal law incorrectly; relief may be granted only if the application of federal law is unreasonable. Id. at 411. The state court's factual determinations are "presumed to be correct," and the petitioner bears the burden of rebutting that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Though the Fourth Circuit has not ruled on the issue, federal courts in other circuits have held evidentiary hearings to assess the reasonableness of a state court's adjudication. Valdez v. Cockrell, 274 F.3d 941, 952 (5th Cir. 2001) (noting that an evidentiary hearing in federal court "may assist the district court in ascertaining whether the state court reached an unreasonable determination under either § 2254(d)(1) or (d)(2)"); Teti v. Bender, 507 F.3d 50, 59 (1st Cir. 2007) ("While it might seem questionable to presume the correctness of material facts not derived from a full and fair hearing in state court [under 28 U.S.C. § 2254(e)(1)], the veracity of those facts can be tested through an evidentiary hearing before the district court where appropriate."); Davis v. Lambert, 388 F.3d 1052, 1065 (7th Cir. 2004) (finding that pre-AEDPA standards govern the granting of a hearing when the petitioner has developed the factual basis of his claim and remanding for an evidentiary hearing though "at this point in the proceedings, it is far from clear that the state courts did not unreasonably apply Strickland in finding no prejudice"). This court does presume to reconcile these approaches. However, with limited exceptions, such hearings are prohibited under the AEDPA "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2). To

16

avoid this prohibition, the petitioner must have acted with diligence to develop the claim in state court. "Diligence will require in the usual case that the [petitioner], at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." <u>Williams (Michael) v. Taylor</u>, 529 U.S. 420, 437 (2000).

Conversely, "[a] petitioner who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in <u>Townsend v. Sain</u>, 372 U.S. 293, 313 (1963)." <u>Conaway</u>, 453 F.3d 567, 582 (4th Cir. 2006). Those factors are:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

<u>Townsend</u>, 372 U.S. at 313. But even if the petitioner is not entitled to a hearing, the district court may grant an evidentiary hearing in its discretion so long as the petitioner has not failed to develop the factual basis for that claim in state court. <u>Schriro</u>, 127 S. Ct. at 1939 ("Prior to the [AEDPA], the decision to grant an evidentiary hearing was generally left to the sound discretion of district courts. That basic rule has not changed." (citations omitted)). In exercising that discretion, however, a district court must be mindful that it must view the petitioner's claim through the AEDPA's highly deferential statutory lens: "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." <u>Id.</u> at 1940.

17

With the above precepts in mind, the court exercised its perceived discretion to grant an evidentiary hearing. As stated earlier, by his own account Drewry thought the records he failed to read would have been "very valuable" because they documented that the "*Commonwealth* diagnosed [Winston] with mental retardation as a child." (App. 338-39.) Nevertheless, the Supreme Court of Virginia found that counsel's performance was not deficient. Although counsel's "strategic choices made after thorough investigation . . . are virtually unchallengeable," Strickland, 466 U.S. at 690, contextually, simply not reading essential documents that are facially significant to competent capital defense counsel did not seem to this court to be any choice at all.[14] Under the circumstances, this court concluded that it was not implausible that Winston could establish deficient performance, even in light of the AEDPA's deferential standards.

But even if Winston demonstrated deficient performance, establishing ineffective assistance of counsel also requires him to prove prejudice – a reasonable probability that but for counsel's deficient performance, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. Although Winston's task was difficult because of the three earlier full-scale IQ scores, the court did not find it wholly implausible that Winston could demonstrate that prejudice resulted from Drewry's failure to review the records and learn of the 1997 classification. The overarching question, as this court viewed it, was not the ultimate question

---

[14]The court is aware of and sensitive to the difficulties and burdens capital trial counsel must frequently shoulder. It is essential that they be able to delegate certain tasks and rely on expert opinions with confidence. Cf. Wilson v. Green, 155 F.3d 396, 403 (4th Cir. 1998) (observing that, where counsel had received psychologist's opinion that defendant was not mentally ill at time of offense, "counsel was not required to second-guess the contents of this report," but rather "understandably decided not to spend valuable time pursuing what appeared to be an unfruitful line of investigation." (internal quotation marks omitted)). However, capital trial counsel cannot outsource their fundamental responsibilities.

18

that a criminal trial jury would determine – whether Winston was in fact mentally retarded under Virginia's definition – but whether there was a reasonable probability that a trial jury could conclude that he was. Given Drewry's assertion that he would have taken different steps during his representation of Winston if he had read the records, and given this court's conclusion that Winston diligently attempted to demonstrate both that he was mentally retarded and that the evaluation supporting that claim had been destroyed, the court thought it appropriate to hold an evidentiary hearing to scrutinize carefully the question of prejudice.[15] Accordingly, this court ordered the evidentiary hearing.

## III.

When the Supreme Court of Virginia adjudicated Winston's ineffective assistance claim, it confronted three full-scale IQ test scores over 70 and circumstantial evidence of a likely destroyed fourth test result, that may have reflected a score of 70 or below. In contrast, Winston located and presented to this court the actual result from the fourth test, reflecting a full-scale score of 66. However, he has demonstrated no valid reason why he could not have presented that same evidence to the Supreme Court of Virginia. This raises the interrelated questions of whether Winston failed to develop in state court proceedings the factual basis he now relies on to support his ineffective assistance claim and whether Winston has failed to exhaust that claim. Post hearing, these questions are perhaps best viewed analytically as exhaustion questions:

---

[15]The evidence presented at the hearing also addressed Winston's claim that Atkins bars his execution because he is mentally retarded. Since Winston has procedurally defaulted this claim, the court may reach the merits only if it finds "cause for the procedural default and prejudice attributable thereto." Murray v. Carrier, 477 U.S. 478, 485 (1986). Since Winston can establish cause by proving ineffective assistance of counsel, the court examines that claim first. Id. at 488.

whether the current incarnation of Winston's ineffective assistance claim was fairly presented to the Supreme Court of Virginia or whether Winston has fundamentally altered the claim he presented. This court concludes that Winston did not fairly present the current incarnation of his ineffective assistance claim to the Supreme Court of Virginia and that he fundamentally altered the claim he presented. Consequently, Winston has failed to exhaust his newly positioned ineffective assistance claim, and since the Supreme Court of Virginia will no longer consider the claim, the claim is also procedurally defaulted and the court can consider it only if Winston satisfies the miscarriage of justice exception to the procedural default rule by showing that he is actually innocent of the death penalty.

When a habeas claim presents interrelated questions of factual development and exhaustion after an evidentiary hearing, the issue is perhaps "more accurately analyzed under the 'exhaustion' rubric of § 2254(b)." Dowthitt v. Johnson, 230 F.3d 733, 745 (5th Cir. 2000).[16] Exhaustion, which is rooted in federalism and comity, requires the petitioner to "fairly present[]" his claim to the state courts. Picard v. Connor, 404 U.S. 270, 275 (1971). To "fairly present" a claim, "the petitioner must have presented to the state court 'both the *operative facts* and the controlling legal principles.'" Kasi v. Angelone, 300 F.3d 487, 501-02 (4th Cir. 2002) (emphasis

---

[16]As noted earlier, the failure to develop inquiry is governed by 28 U.S.C. § 2254(e)(2): except in certain narrowly circumscribed instances, that provision prohibits the district court from holding an evidentiary hearing on a claim if the petitioner failed to develop the factual basis of that claim in the state court proceedings. To avoid this prohibition, petitioner must have acted with diligence to develop the facts in state court. If he has done so, § 2254(e)(2) is no obstacle to a hearing. See Williams (Michael), 529 U.S. at 430. Federalism and comity underpin the failure to develop inquiry. Although nothing prohibits the court from revisiting its earlier decision that petitioner did not fail to develop the record in the state court proceedings (assuming the court made the right call at the time), analytically the question of whether the court is able to consider new evidence developed at the hearing is an exhaustion question.

added) (quoting Mathews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997)). "[T]he state courts must be given a fair opportunity to apply controlling legal principles to the facts bearing upon [a petitioner's] constitutional claim." Wise v. Warden, 839 F.2d 1030, 1033 (4th Cir. 1988) (internal quotations omitted) (insertion in original). As long as the new evidence does not "*fundamentally alter* the legal claim already considered by the state courts," the petitioner has satisfied the exhaustion requirement. Vasquez v. Hillery, 474 U.S. 254, 260 (1986) (emphasis added). "Where questions concerning exhaustion arise, the petitioner bears the burden of demonstrating that the state remedies have, in fact, been exhausted." Mallory v. Smith, 27 F.3d 991, 994 (4th Cir. 1994).

It is clear that the new evidence obtained from Lageman fundamentally alters the operative facts the Supreme Court of Virginia confronted when it concluded that Winston failed to show prejudice. Had the Supreme Court of Virginia confronted a full-scale IQ score of 66, it might have viewed the Strickland prejudice prong differently. Instead, Winston presented three scores over 70 and evidence that a likely non-retrievable fourth score might have been under 70. Therefore, there is a substantial difference between the operative facts that the Supreme Court of Virginia confronted and the operative facts presented here. There is a substantial difference between a likely non-retrievable score that might have been below 70, and an actual score of 66. The Supreme Court of Virginia did not have a "fair opportunity" to adjudicate the claim as Winston has positioned it in this court. Indeed, any other reading of the "fair opportunity" component of the exhaustion requirement would fail to give effect to the AEDPA's mandate that the reasonableness of the state court's factual findings be assessed "in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2); see Holland v. Jackson, 542

21

U.S. 649, 652 (2004) (per curiam) ("[W]e have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it."). Therefore, the court concludes that Winston failed to exhaust his claims he presented in this court in the Supreme Court of Virginia.

In reaching this conclusion, the court notes that Winston's circumstances are not analogous to the "classic catch-22" situation in which a petitioner must submit appropriate evidence to the state court in order to be accorded an evidentiary hearing, and the state court has denied him the subpoena power necessary to obtain that evidence. See Conaway, 453 F.3d at 584. Habeas counsel's reasoning that they were free to forego requesting a subpoena on futility grounds does not pass muster because it "undermine[s] the policies of comity and efficiency that underlie the exhaustion doctrine." See Wise, 839 F.2d at 1033. It is equally fundamental that habeas counsel has suggested no sustainable reason why they could not have approached Lageman earlier during the pendency of state habeas proceedings and secured the same evidence and presented that evidence to the Supreme Court of Virginia. Consequently, Winston has not exhausted the prejudice prong of his ineffective assistance claim to the extent that it depends upon those new facts, and because Virginia will not consider the newly positioned claim,[17] it is simultaneously unexhausted and defaulted.

In concluding that Winston's newly presented IQ evidence fundamentally alters the claim he presented to the Supreme Court of Virginia, the court notes that the circumstances in this case

---

[17]As the Fourth Circuit explained in Hedrick v. True, Virginia Code § 8.01-654.1 limits capital habeas petitioners "to one state habeas petition filed within sixty days of the denial on direct appeal of the petitioner's petition for writ of certiorari with the United States Supreme Court." 443 F.3d at 365.

differ from the circumstances the Fifth Circuit confronted in <u>Morris v. Dretke</u>, 413 F.3d 484 (5th Cir. 2005), when it held that new IQ evidence did not fundamentally alter Morris's <u>Atkins</u> claim and his claim was therefore exhausted. In <u>Morris</u>, the petitioner lacked IQ evidence, but "the *crucial fact* that Morris possessed sufficient indicators for a diagnosis of mental retardation had already been presented to the state courts." <u>Id.</u> at 498 (emphasis added). In contrast, in state habeas Winston presented three IQ scores above 70. He alluded to a potential fourth IQ test that was possibly above 70, but his petition included an affidavit concluding that the test was probably destroyed. Under these circumstances, there was affirmative evidence before the Supreme Court of Virginia that Winston did not meet Virginia's intellectual functioning requirement. Moreover, it was not ascertainable from the state court record whether this additional test would ever surface, and if it did, whether it would even support a finding of subaverage intellectual functioning under the Virginia statute.

Accordingly, the court finds that in light of the new evidence presented for the first time in federal court, Winston's claim as presented in this court is unexhausted. Since the newly positioned claim is procedurally defaulted in state court, this court may examine it only if Winston satisfies the miscarriage of justice exception by demonstrating that he is "actually innocent of the death penalty."

### IV.

Winston contends that any procedural default is excused under the fundamental miscarriage of justice exception to the procedural default rule because he is "actually innocent of the death penalty" due to his mental retardation, a claim he can never default. In its earlier opinion, the court addressed and rejected Winston's argument that he is actually innocent of

23

capital murder because he was not the triggerman in the shooting, Winston v. Kelly, 2008 WL 2234587, at *5-7, but it did not address Winston's current claim that he is actually innocent of the death penalty because he is mentally retarded. It does so now in light of all of the evidence, including all the evidence presented at the evidentiary hearing, and concludes that Winston has failed to establish that he is actually innocent of the death penalty.

A state habeas petitioner whose claims are procedurally defaulted "may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence." Herrera v. Collins, 506 U.S. 390, 404 (1993). The actual innocence standard is "demanding and permits review only in the extraordinary case." House v. Bell, 547 U.S. 518, 538 (2006) (internal quotations and citations omitted). "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Herrera, 506 U.S. at 404. Though "the concept of 'actual innocence' [does] not translate easily . . . into the capital sentencing context," this court may reach the merits of a state prisoner's defaulted claims on habeas review if he shows that "but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." Sawyer v. Whitley, 505 U.S. 333, 336, 340 (1992).[18] In determining whether a habeas petitioner has met this standard, a federal

---

[18]Virginia requires the defendant to prove by a preponderance of evidence that he is mentally retarded. Va. Code. Ann. § 19.2-264.3:1.1(C). Recognizing that the actual innocence standard contains a clear and convincing burden of proof for "those elements that render a defendant eligible for the death penalty," Sawyer, 505 U.S. at 336, 347, here the court applies the more lenient preponderance of the evidence standard to Winston's claim of actual innocence because he argues his mental retardation, as defined by the Virginia statute, renders him categorically ineligible for the death penalty. This court assumes, but does not decide, that this more lenient burden applies as a result of the preponderance standard specified by the Virginia statute and the necessity of applying actual innocence jurisprudence to an Atkins claim.

24

habeas court "must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the 'rules of admissibility that would govern at trial.'" House v. Bell, 547 U.S. at 538 (quoting Schlup v. Delo, 513 U.S. 298, 327-28 (1995)). It must then make "a probabilistic determination about what reasonable, properly instructed jurors would do." Schlup, 513 U.S. at 329.

Essentially, Winston's new evidence of subaverage intellectual functioning is a full-scale IQ score of 66 and conflicting testimony about whether the Flynn effect and the SEM should be used to adjust Winston's previous three full-scale IQ scores that are above 70, resulting in scores with ranges that partially fall two standard deviations below the mean. Dr. Hagan, the Warden's expert, rejected adjusting Winston's scores to account for the Flynn effect and the SEM because neither textbooks nor practitioners recommended adjusting individual scores for the Flynn effect, and there was no basis for using an SEM to find that an individual's true IQ falls in the range below the earned score rather than above it. Even Dr. Reschly, Winston's expert, testified that the Flynn effect was "controversial" and that there was "not a consensus" on its application.

The new evidence of adaptive behavior limitations also is conflicting and equivocal. Dr. Reschly opined to a reasonable degree of psychological certainty that Winston had significant limitations in adaptive behavior before the age of 18, and he based this conclusion on his interviews with Winston, and Winston's relatives, former guardian, and school teacher, as well as his review of Winston's criminal file, school records, and Dr. Nelson's report. Dr. Hagan testified that Winston had adaptive behavior deficits, but in his opinion Winston's limitations did not significantly impair his functioning. He based his conclusion on his interview with Winston and his review of Winston's court and school records.

25

Having considered the new evidence of mental retardation in light of all the other evidence in the record, the court concludes that Winston has failed to "make the stringent showing" required to prove that he is actually innocent of the death penalty. House v. Bell, 547 U.S. at 522. A reasonable juror could find Winston's three IQ scores over 70 more persuasive than his one score below 70 and could reject the factual assertion that these higher scores should be adjusted downward for the Flynn effect or the SEM.[19] A reasonable juror could also reject Winston's evidence of adaptive behavior deficits, given the differing expert testimony and the even larger and more conflicting spectrum of adaptive behavior information in the record. Simply put, Winston cannot show that no reasonable juror would have found him eligible for the death penalty. Accordingly, his claim of actual innocence cannot excuse the procedural default of his newly positioned ineffective assistance claim or his Atkins claim.

## V.

As this court has made plain, it granted Winston a hearing on his ineffective assistance claim because it did not find it wholly implausible that he could prove that claim even in light of the AEDPA's deferential standards. Consequently, it held a hearing without first deciding that the Supreme Court of Virginia's adjudication of the claim was based on unreasonable determination of the facts "in light of the evidence presented in the State court proceeding" – a prerequisite to relief under 28 U.S.C. § 2254(d)(2). The court has yet to decide expressly whether Virginia's adjudication of Winston's ineffective assistance claim, *as it was fairly*

---

[19]Atkins left to the states the responsibility of defining mental retardation, and the Virginia Supreme Court is the ultimate arbiter of what the Virginia statute defining mental retardation requires. Although this court considers the Flynn effect and the SEM in its actual innocence of the death penalty calculus, it assumes without deciding that the court can consider them.

*positioned before that court*, was based on an unreasonable determination of the facts, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court; until now, it has only decided that it might be.[20] This is procedurally problematic because considering the evidence presented for the first time in federal court – for any purpose other than determining "actual innocence of the death penalty" – without first deciding whether the Supreme Court of Virginia unreasonably adjudicated Winston's ineffective assistance claim skirts the temporal nature of review 28 U.S.C. § 2254(d)(2) contemplates.[21] Therefore, the court concludes that a retrospective analysis is now appropriate and finds from

---

[20]At the court's request, the parties have addressed the interplay between the AEDPA's deferential standards and the evidence adduced at the evidentiary hearing. Winston maintains that because the court properly granted an evidentiary hearing, it no longer assesses reasonableness under 28 U.S.C. § 2254(d)(2) and that 28 U.S.C. § 2254(e)(1) provides the only applicable deferential prism. The Warden maintains that this court cannot consider new evidence adduced at the evidentiary hearing unless it first determines, without regard to that new evidence, that the Supreme Court of Virginia's adjudication of Winston's ineffective assistance claim was legally and/or factually unreasonable "in light of the evidence presented in the State court proceeding" as 28 U.S.C. § 2254(d)(2) requires.

[21]The Supreme Court has not explained whether the AEDPA's deferential standards apply when a federal court hears new evidence that was not presented in the state court but nevertheless finds that the petitioner has properly exhausted the available remedies. See Holland v. Jackson, 542 U.S. at 653 ("Where new evidence is admitted, some Courts of Appeals have conducted de novo review on the theory that there is no relevant state-court determination to which one could defer." (citing Monroe v. Angelone, 323 F.3d 286, 297-99 & n.19 (4th Cir. 2003)).

In Monroe, the Fourth Circuit reviewed a Brady claim based on evidence presented in state habeas and evidence presented for the first time in federal court. Although the Fourth Circuit accorded AEDPA deference on an "item-by-item" basis to the state court's determination that particular pieces of evidence were exculpatory, it could not defer to the state court's determination of Brady's materiality element because that element required a collective assessment of the withheld evidence and "no state court considered all the Brady material presented here." Monroe, 323 F.3d at 298-99. As a result, when "newly discovered evidence [was] . . . the proverbial straw that broke the camel's back," id. at 299 n.19, the Fourth Circuit concluded that federal courts would need to make an "independent assessment" of the evidence underlying the Brady violation. Id. at 299. In this case, the court need not address these analytical concerns because it has already determined that Winston has failed to exhaust his ineffective assistance claim based on the newly presented IQ evidence in federal court.

27

that analysis that the Supreme Court of Virginia's decision that Winston failed to show prejudice from his counsel's allegedly deficient performance was not an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The court also finds that the Supreme Court of Virginia's decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law under 28 U.S.C. § 2254(d)(1). Consequently, the court dismisses Winston's ineffective assistance claim and also finds that it cannot serve as cause and prejudice to excuse the procedural default of his Atkins claim.[22]

In rejecting Winston's ineffective assistance claim, the Supreme Court of Virginia noted that the evidence of record did not support the conclusion that Winston was mentally retarded "in accordance with the legal definition of mental retardation established by the legislature." Winston v. Warden, 2007 WL 678266, at *15. That court then fairly summarized the evidence of record insofar as it related to the subaverage intellectual functioning prong of Virginia's statutory definition of mental retardation:

> The record, including the evidence presented at trial and the documents upon which petitioner now relies, demonstrates that petitioner was administered three standardized tests for measuring intellectual functioning. Petitioner achieved full-scale scores of 77, 76, and 73 on three administrations of the Welsher Intelligence Scale for Children-Revised. While petitioner offered evidence that he was once described as "mildly mentally retarded" for the purposes of special education eligibility, the definitions of mental retardation provided by petitioner demonstrate that for special-education eligibility, a candidate may, nonetheless, have an IQ score above 70. Furthermore, petitioner offers no objective data in support of his claim of mental retardation.

_____

[22]As this court stated in its previous opinion, there is a split of authority as to whether a federal habeas court must continue to defer to the state court's adjudication of a freestanding ineffective assistance of counsel claim when the federal habeas court decides whether that claim constitutes cause for procedural default. Winston v. Kelly, 2008 WL 2234587, at *10 n.6. For the reasons stated in that opinion, the court applies the AEDPA's deferential lens to the ineffective assistance claim when presented as cause for procedural default. Id.

Case 7:07-cv-00364-SGW   Document 129   Filed 03/06/09   Page 28 of 32   Pageid#: 1453

Id. Although Winston quibbles with the Supreme Court of Virginia's characterization of the overlooked evidence as evidence that Winston was once described as "mildly mentally retarded" for special education purposes based on a definition that includes IQ scores above 70, the documents Winston presented to the Supreme Court of Virginia fairly support that characterization. The supporting documents expressly note that a candidate for special education may be able to meet Fairfax County's definition of mental retardation even if he or she has an IQ score above 70. (App. 36.) Therefore, the Supreme Court of Virginia's adjudication of the claim did not result in a decision that was based on unreasonable determination of the facts "in light of the evidence presented in the state court proceeding."[23]

Winston argues that even if the Supreme Court of Virginia did not unreasonably determine the facts, its adjudication nevertheless resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States within the meaning of 28 U.S.C. § 2254(d)(1).[24] He

---

[23]The Court recognizes that a state court's decision is based on an unreasonable determination of the facts not only when the state court's decision is based on facts that the record does not reasonably support but also when it resolves a factual issue without affording the petitioner process that is adequate under the circumstances to resolve the matter the court purports to resolve – when it resolves the facts in a procedurally unfair way. For example, the "classic catch-22" in which a petitioner is obliged to submit appropriate evidence to the state court to receive an evidentiary hearing, and the state court has denied him the subpoena power necessary to obtain that evidence. E.g. Conaway v. Polk, 453 at 584; see also 1 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 20.2c n.78 (5th ed. 2008).

[24]Before the enactment of the AEDPA, the Supreme Court held in Strickland that,

in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered ineffective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d) . . . . Although state court findings of fact are made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law

29

contends that the adjudication is an unreasonable application of clearly established Federal law because in assessing prejudice the Supreme Court of Virginia failed to account for the Flynn effect and the SEM in concluding that Winston's three full-scale IQ scores above 70 provide no objective evidence of his mental retardation. The argument appears to have two rationales. According to the first rationale, the Virginia statute defining mental retardation necessarily requires accounting for the Flynn effect and the SEM. According to this rationale, the Supreme Court of Virginia could not properly assess prejudice – the probability of a different outcome in the state proceeding – without accounting for factors that are necessary to inform the decision of whether Winston's intellectual functioning is in reality two standard deviations below the norm as the Virginia statute contemplates. Under the second rationale, <u>Atkins</u> implicitly requires the court to take the Flynn effect and the SEM into account in assessing prejudice.

The Court is not persuaded. As to the first rationale, the Supreme Court of Virginia is the ultimate arbiter of what its statute requires. Winston argued in state habeas that his full-scale IQ scores of 77, 73 and 76 support his mental retardation claim when properly adjusted for the Flynn effect and the SEM. However, by noting that it had "previously held that the maximum score for a classification of mental retardation is an IQ score of 70" and concluding that Winston had no qualifying score, the Supreme Court of Virginia implicitly rejected the argument that Virginia's statutory definition required that either be taken into account. See <u>Green v. Johnson</u>, 515 F.3d

---

and fact."

<u>Strickland</u>, 466 U.S. at 698. Most post-AEDPA cases continue to make clear that both prongs of an ineffective assistance adjudication are subject to § 2254(d)(1)'s unreasonable application provision because "the special prophylaxis of section 2254(d)(2) applies only to determinations of 'basic, primary, or historical facts.'" <u>Ouber v. Guarino</u>, 293 F.3d 19, 27 (1st Cir. 2002). <u>But see</u> <u>Czere v. Butler</u>, 833 F.2d 59, 64 (5th Cir. 1987) ("<u>Strickland</u> requires that petitioner 'affirmatively prove' prejudice. . . . This is an essentially factual inquiry.").

30

290, 300 n.2 (4th Cir. 2008).[25] As to the second rationale, "Atkins expressly left to the states the task of developing appropriate ways to enforce the constitutional restriction upon the execution of sentences." Larry v. Branker, 552 F.3d 356, 369 (4th Cir. 2009).

But Winston's reasoning is flawed at an even more fundamental level because it treats this court's review as though it were de novo. This is habeas, not direct review. "Section 2254(d)(1) requires federal habeas courts to ascertain whether the underlying state court adjudication of a claim on the merits '*resulted in a decision* that was contrary to, or involved an unreasonable application of clearly established' Supreme Court precedent." Bell v. Jarvis, 236 F.3d at 160. That section renders immaterial this court's "independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the defendant's constitutional rights were violated during the state court proceedings." Id. Therefore, under the AEDPA, this court does not have the responsibility of determining whether the state court has erred or whether its reasoning is analytically flawed. As Williams (Terry) v. Taylor, 529 U.S. 362 (2000), made clear, "an erroneous or incorrect decision is not the

_____

[25]At the evidentiary hearing, the court heard from acknowledged experts in the field of mental retardation who have reached nearly opposite conclusions on a fact-laden determination of whether the court should, under the circumstances present here, account for the Flynn effect in evaluating Winston's first three full-scale IQ scores of 77, 76, and 73. They have also disagreed concerning the proper application of the SEM. Winston currently frames the issue of whether the Supreme Court of Virginia was constitutionally required to account for the Flynn effect and the SEM in assessing prejudice as an unreasonable application issue under § 2254(d)(1). Constitutionally required or not, however, the constitutional issue can rise no higher than its facts. Although § 2254(d)(2) prohibits the court from *granting* relief unless the state court's adjudication resulted in decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, that section does not prevent the court from relying on facts the court has independently determined in the course of a hearing to *support* the state court's adjudication of the claim. Under the circumstances here, the court finds that Winston has failed to demonstrate a scientific imperative to adjust his scores.

31

equivalent of unreasonable one." Bell, 236 F.3d at 162 n.9. Indeed, habeas courts must apply §
2254(d)(1) deference to wholly unreasoned, summary adjudications. Id. at 158.

In answering the question of whether the Supreme Court of Virginia's rejection of
Winston's ineffective assistance claim resulted in a decision that was contrary to, or involved an
unreasonable application of clearly established Federal law, under Supreme Court precedent, this
court assumes deficient performance and focuses on Strickland's prejudice prong. The question
then distills to this: given three full-scale performance IQ scores above 70 and potentially a fourth
score that could be below 70, was it objectively unreasonable for the Supreme Court of Virginia to
conclude that Winston had failed to show prejudice. The court concludes that it was not
objectively unreasonable. Accordingly, the court rejects Winston's ineffective assistance claim as
it was fairly positioned before the Supreme Court of Virginia.

## VI.

For the foregoing reasons, the court finds that Winston failed to exhaust and has
procedurally defaulted his newly positioned ineffective assistance claim, that he cannot excuse
this procedural default by showing he is actually innocent of the death penalty, and that the
Supreme Court of Virginia's adjudication of the merits of Winston's ineffective assistance claim,
as it was fairly positioned before that court, was not unreasonable under 28 U.S.C. § 2254(d), at
least as to the prejudice prong. Consequently, the procedural default of Winston's Atkins claim is
not excused. Therefore, the court **DENIES** his petition for a writ of habeas corpus.

**ENTER**: This March 6, 2009.

_____
UNITED STATES DISTRICT JUDGE

32