CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 16 2011

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| LEON JERMAINE WINSTON, | ) |
| | ) |
| PETITIONER, | ) CIVIL ACTION NO.: 7:07CV00364 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| LORETTA K. KELLY, Warden, | ) By: Samuel G. Wilson |
| Sussex I State Prison, | ) United States District Judge |
| | ) |
| RESPONDENT. | ) |

A jury in the Circuit Court for the City of Lynchburg, Virginia found petitioner, Leon Jermaine Winston, guilty in June 2003 of three counts of capital murder and imposed three death sentences. Having exhausted his state court remedies, see Winston v. Commonwealth, 604 S.E.2d 21 (Va. 2004) and Winston v. Warden of Sussex I State Prison, 2007 WL 678266 (Va. Mar. 7, 2007) (unpublished), Winston filed a habeas petition in this court pursuant to 28 U.S.C. § 2254 raising more than 30 claims. The court rejected all of his claims except two interrelated claims: the claim that because he is mentally retarded, Atkins v. Virginia, 536 U.S. 304 (2002), bars his execution, a claim he procedurally defaulted because he failed to raise it at trial, and the claim that his counsel was ineffective in relation to that claim, thereby excusing his procedural default. Winston v. Kelly, 624 F. Supp. 2d 478 (W.D. Va. 2008). Although the Supreme Court of Virginia earlier rejected Winston's ineffective assistance claim on the merits because he had failed to satisfy the deficient performance and prejudice prongs of Strickland v. Washington, 466 U.S. 668 (1984), Winston v. Warden of Sussex I State Prison, 2007 WL 678266, this court concluded that it was not wholly implausible that Winston could establish the claim even in light

of the AEDPA's deferential standards. Winston v. Kelly, 624 F. Supp. 2d at 512-16. Accordingly, this court held an evidentiary hearing to resolve the claim.

At that hearing, Winston presented new evidence, evidence that he had not presented to the Supreme Court of Virginia, including an intelligence quotient ("IQ") score of 66 that he received as part of a psychological exam in 1997. The court found that this new IQ score fundamentally altered Winston's ineffective assistance claim and that Winston had failed to account for his failure to present it to the Supreme Court of Virginia, thus rendering that claim, as newly positioned, unexhausted and procedurally defaulted. Winston v. Kelly, 600 F. Supp. 2d 717, 734-36 (W.D. Va. 2009). The court then reviewed the new evidence to determine whether Winston was "actually innocent of the death penalty" so as to excuse his procedural default, and concluded that Winston could not make the stringent showing actual innocence required. Id. at 735-36. This court then noted that it considered its handling of the ineffective assistance claim to be procedurally problematic, because the procedure the court followed effectively skirted the temporal nature of review 28 U.S.C. § 2254(d)(2) requires by holding an evidentiary hearing on Winston's ineffective assistance claim without first expressly deciding whether the Supreme Court of Virginia's adjudication of that claim, as it was fairly positioned before that court, was based on an unreasonable determination of facts or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Id. at 737-38. The court then examined Winston's claim in light of the record it found to have been fairly presented to the Supreme Court of Virginia, and found that the Supreme Court of Virginia's adjudication of the merits of Winston's ineffective assistance claim, at least as to Strickland's prejudice prong, was not unreasonable. Id. at 738-40.

The Court of Appeals affirmed this court's dismissal of all of Winston's claims except his Atkins-related ineffective assistance claim. Winston v. Kelly, 592 F.3d 535 (4th Cir. 2010) cert. denied, 131 S. Ct. 136 (2010). It vacated this court's decision as to that claim, and remanded that claim for further consideration. It gave explicit instructions to this court to consider all the evidence, including Winston's additional IQ score, affording deference under § 2254(e)(1) "to any relevant factual findings" made by the Supreme Court of Virginia, but affording no deference under § 2254(d) to the Supreme Court of Virginia's adjudication of the claim. Id. at 557-58. Following the directives of the Court of Appeals, this court now concludes from all the evidence it heard, including the new evidence, that there is a reasonable probability that but for counsel's unprofessional errors, the outcome of Winston's proceeding would have been different. Accordingly, the court grants Winston's petition for a writ of habeas corpus. As a consequence, Virginia must conduct a trial on the question of whether Winston is mentally retarded, and sentence him accordingly, or otherwise resentence him without the possibility of death.

I.

The procedural history, legal setting, and summary of the evidence pertinent to the issue that is before this court on remand are explained in the three published opinions referenced above, two by this court and one by the Court of Appeals. Though the court will not repeat all of those matters here, it repeats enough background information to provide context for this court's findings of fact and its decision.

The United States Supreme Court held in Atkins that the Eighth Amendment prohibits the execution of the mentally retarded, but tasked the states with developing "appropriate ways" to enforce that restriction. 536 U.S. at 317. Virginia law defines mental retardation as

> a disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean, and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Va. Code Ann. § 19.2-264.3:1.1(A) (2006). Defendants bear the burden of proving mental retardation by a preponderance of the evidence. § 19.2-264.3:1.1(C).

The intellectual functioning prong is "demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean." § 19.2-264.3:1.1(A). The Supreme Court of Virginia, consistent with the standards of the American Psychiatric Association, has determined a full-scale IQ score of 70 or less is the "standardized measure of intellectual functioning" that indicates mental retardation. Johnson v. Commonwealth, 591 S.E.2d 47, 59 (Va. 2004), vacated on other grounds, 544 U.S. 901 (2005). However, "a habeas petitioner is not required to submit an IQ score of 70 or less from a test taken before he turned the age of eighteen," but rather must prove only "that his intellectual functioning would have fallen below this standard before he turned the age of eighteen." Hedrick v. True, 443 F.3d 342, 367 n.2 (4th Cir. 2006). Virginia law requires adaptive behavior assessments to be "based on multiple sources . . . including clinical interview, psychological testing and educational, correctional and vocational records," and at least one standardized, generally accepted measure of adaptive functioning. § 19.2-264.3:1.1(B)(2).

In Winston's capital murder trial, B. Leigh Drewry, Jr., one of two court-appointed lawyers, "accepted responsibility for gathering the mitigation evidence." (App. to Pet. Writ of Habeas Corpus 337.) In carrying out that responsibility Drewry obtained Winston's "school records, social service records, and hospital records." (App. 338.) Those records included three

4

psychological evaluations, each accompanied by an intelligence test. (App. 1-2, 3-6, 11-15.) Winston took the first of these intelligence tests, the Wechsler Intelligence Scale for Children-Revised (WISC-R), in 1987 at age seven and received a verbal IQ score of 91, a performance IQ score of 67, and a full-scale IQ score of 77. (App. 1.) At that time he was judged to have "mentally deficient to average intelligence." (App. 2.) Winston took the WISC-R again in 1990 at age ten and received a verbal IQ score of 74, a performance IQ score of 75, and a full-scale IQ score of 73. (App. 4.) The evaluating psychologist noted that Winston was functioning in the "[b]orderline range of general intellectual ability," but believed that the test was an "underestimate" of Winston's abilities. (App. 4.) The psychologist also wrote, "[Winston's] ability to recall specific verbal facts which are typically acquired through education and experience is extremely deficient and falls within the Mentally Retarded range (1st percentile)." (App. 5.) Winston took the third intelligence test, the Wechsler Intelligence Scale for Children-III (WISC-III), in 1995 at age fifteen and received a verbal IQ score of 60, a performance IQ score of 89, and a full-scale IQ score of 76. (App. 13.) The evaluating clinical psychologist attributed the precipitous decline in Winston's verbal IQ score to a "neurological insult" and found that he had "borderline intellect and severe verbal processing problems." (App. 14.) She noted that Winston's immaturity and passiveness "place him at a risk to be easily manipulated by others. He is likely to always follow the easiest path, the strongest leader. He is not likely to initiate activity, either good or bad, on his own." (App. 14-15.)

According to other records Drewry received, on October 30, 1996, the local screening committee of the Fairfax County Department of Student Services and Special Education ("Special Education Department") issued a report that recommended an additional psychological evaluation for Winston. (Evid. Hr'g Pet'r's Ex. D, at 843, Nov. 19-20, 2008.) Three months

later, on February 5, 1997, a Special Education Department committee determined Winston was eligible for special education due to "mild retardation" and that Winston "demonstrate[d] a reduced rate of intellectual development and a level of academic achievement below that of age peers" and "concurrently demonstrate[d] deficits in adaptive behavior." (App. 69.)

At sentencing, Drewry did not attempt to prove that Winston was mentally retarded and therefore not subject to execution under Atkins. Instead, he attempted to shift the burden of proof to the Commonwealth, arguing to the court that the Commonwealth was required to prove Winston was eligible for the death penalty by showing that he was *not* mentally retarded. (Trial Tr. 31, June 13, 2003.)[1] The trial court rejected Drewry's argument, and Drewry had not prepared for and did not mount an Atkins defense before the jury. The jury found Winston guilty of three counts of capital murder and imposed three death sentences. Winston's direct appeals were unsuccessful. Winston v. Commonwealth, 604 S.E. 2d 21, 50 (Va. 2004) cert. denied, 546 U.S. 850 (2005), reh'g denied, 546 U.S. 1056 (2005). Winston then challenged his conviction and death sentence in a state habeas corpus petition raising more than thirty claims, including the claim that, because he is mentally retarded, Atkins bars his execution, and that his counsel were ineffective because they failed to investigate, adduce evidence, and make this argument at sentencing.

According to Drewry's own account in an affidavit filed in the state habeas proceedings and later in this court, Drewry did not notice or read the records relating to Winston's 1997 classification as mildly retarded. Instead, he forwarded all the records to Dr. Evan Nelson, the clinical psychologist appointed to assist Winston in capital sentencing. Drewry claimed to have been unable to review all the records on his own and "relied on Dr. Nelson to thoroughly review

---

[1] Virginia Code § 19.2-264.3:1.1, passed after Winston's offense, but before, and therefore applicable to, Winston's trial, requires a defendant raising mental retardation as a bar to execution to give notice before trial and to prove by a preponderance of the evidence that he or she is mentally retarded.

6

the records and tell [him] what [he] needed to know." (App. 338.) According to Drewry's affidavit, "Dr. Nelson told [Drewry] he did not think [Drewry and his co-counsel, Glenn Berger] could prove [Winston] was mentally retarded as defined by the Virginia statute." (App. 339.) But Drewry considered his own failure to read these records significant. In his words:

> If I had noticed this record before trial, I certainly would have pointed it out to Dr. Nelson and followed-up on this information. I would have challenged his conclusion regarding mental retardation, particularly because the school record indicates [Winston] had adaptive deficits prior to age 18. This record would have been very valuable to us because it was documentation the Commonwealth diagnosed [Winston] with mental retardation as a child.

(App. 338-39.) In any event, there was no follow-up.

At this court's evidentiary hearing, both Drewry and Berger testified that they did not read every page of Winston's records before sending them to Dr. Nelson, and that they did not recall seeing any records referencing Winston's 1997 mild retardation classification during their representation. Both testified that if they had seen these records, they would have claimed that Winston was mentally retarded and not eligible for the death penalty under Atkins and that they had no strategic reason to not pursue such a defense. Dr. Nelson testified at the hearing that though he likely saw the 1997 mild retardation classification in Winston's records, he could not be certain because he could not recall seeing it and did not list it among the sources in his Capital Sentencing Evaluation. Nelson also testified that counsel did not provide him with information from certain teachers, social workers, and family members whose input would have been relevant in assessing adaptive functioning. He acknowledged that had he possessed this additional information while he was assisting the defense, he might have rendered a different opinion concerning the viability of a mental retardation defense.

Marilynn Schneider Lageman also testified at the evidentiary hearing. Lageman was a psychologist in the Fairfax County schools and a member of the Special Education Department

7

committee that recommended the 1997 psychological evaluation. Winston's federal habeas counsel, who was also his state habeas counsel, first located Lageman on November 6, 2008, in Blanco, Texas, twenty-one months after the Supreme Court of Virginia dismissed Winston's state habeas petition and two weeks before this court's evidentiary hearing. Lageman testified that she had performed a psychological evaluation that led to Winston's 1997 mild retardation classification and that she had retrieved this psychological evaluation from a computer disk stored in her home.

As a part of this evaluation, Lageman administered the WISC-III IQ test. On that test, Winston received a verbal IQ score of 60, and a performance IQ score of 77, and a full-scale IQ score of 66. Lageman's report noted that Winston "was cooperative and attempted all tasks presented" during the evaluation, but that his "verbal cognitive skill development falls within the mild range of mental retardation for his age" while "[n]onverbal areas of cognitive functioning are somewhat more developed." (Evid. Hr'g Pet'r's Ex. F, at 2-3.) Though another psychologist was on the committee that ultimately determined Winston was mildly retarded, Lageman noted that such determinations depended on diagnostic criteria, including "[c]ognitive delays . . . based on an IQ test with a score below 70, taking into consideration . . . standard error measurements," "[s]ocial and adaptive skills that also fell in the mild range of mental retardation," and "teacher narratives, parent comments, classroom behavior [and] any information that [the committee] could get regarding people's impressions of the student, to make sure all areas were pretty much falling below that level." (Evid. Hr'g Tr. 5, Nov. 19-20, 2008.) She testified that the committee "typically requested" a standardized adaptive skills test "when mental retardation was an area of possible concern." (Evid. Hr'g Tr. 9-10.)

Christine Johnson, who worked in the Special Education Department and signed Winston's 1997 mild retardation classification form, also testified at this court's hearing. According to Johnson, the form indicates that the committee was unanimous in its determination that Winston was eligible for special education based on mild retardation. She also stated that the committee would have assessed the student's adaptive behavior based on a standardized measure before making a mental retardation determination.

Winston's expert, Dr. Daniel Reschly, opined that "to a reasonable degree of psychological certainty," Winston was mentally retarded under Virginia law before he reached age 18. (Evid. Hr'g Tr. 72-73.) As to the intellectual functioning component, Dr. Reschly testified that, when considering both the standard error of measurement ("SEM") and the "Flynn Effect," the low range for Winston's 1987, 1990, and 1995 IQ test scores is more than two standard deviations below the mean.

As Dr. Reschly explained at the evidentiary hearing, an individual's score on a single IQ test is not necessarily that person's true IQ, but rather indicates the range within which his or her true IQ would fall. The SEM to be applied is 3 to 5 points on either side of the individual's score on a single test, depending on the accuracy desired. A full-scale IQ score of 70 on a single test indicates a 68% probability that the test-taker's true IQ falls between 67 and 73, or a 90% probability that the test-taker's true score falls within 65 and 75.

The Flynn Effect refers to the phenomenon, or perhaps paradox, of rising IQs discovered by the researcher James Flynn in 1987. Flynn observed that every time IQ test scores were renormed, the raw data indicated that a substantial increase in IQ had occurred in the general population since the last time the test was normed. IQ tests are generally renormed every 15-20 years. From these results, two competing theories emerge. Some experts conclude that IQ tests

become less accurate over time, and can eventually greatly overstate a person's actual IQ. Other experts draw the opposite conclusion – that over time, IQ among the general population is increasing, due largely to environmental factors such as better nutrition, improved education, and increased access to information.

Though Dr. Reschly described the Flynn effect as "controversial" and noted that "there is not a consensus" on applying it to reduce the test-taker's score, the phenomenon is an established fact.[2] He also noted seemingly inconsistent variations in Winston's scores on IQ subtests, but could not explain them. Dr. Reschly opined "to a reasonable degree of psychological certainty" that Winston had conceptual, social, and practical adaptive deficits before age 18. Dr. Reschly based these conclusions on, among other sources, his interviews with Winston, some of Winston's relatives, a former guardian, and a former teacher, and on his review of Winston's criminal file, school records, and Dr. Nelson's report.

The Warden's expert, Dr. Leigh Hagan, reached the opposite conclusion based on an interview with Winston and a review of Winston's educational and court records. He opined "that the totality of the behavioral science evidence does not indicate the onset of [mental retardation] originating before the age of 18 years." (Evid. Hr'g Resp't's Ex. A, at 34.) Dr. Hagan testified that there is a lack of consensus as to the cause of the Flynn effect, though the generally accepted practice is to account for the Flynn effect by renorming standardized tests or by "address[ing] it in narrative form, but not to subtract IQ points that the individual has earned." (Evid. Hr'g Resp't's Ex. A, at 32.) He also noted that there is no basis in practice for using SEM

---

[2] Dr. Reschly noted that the task force of Division 33 of the American Psychological Association does "take into account the Flynn Effect through either adjusting the population mean or though subtracting points from IQ scores obtained with tests whose norms are out of date." (Evid. Hr'g Tr. 84-86.) Further, he read passages from the 2007 user guide of the American Association of Mental Retardation's classification manual which acknowledges the existence of the Flynn Effect and states "[i]n cases where tests with aging norms [are] used, a correction for the aging norms is warranted[,]" and he gives an example of how to adjust the population norm. (Evid. Hr'g Tr. 83.) However, as to Winston's 1987, 1990, and 1995 IQ tests, adjustment for the Flynn Effect alone (that is, without account for the SEM) results in only the 1990 test score falling to at least two standard deviations below the mean.

to find that an individual's true IQ falls in the range below the earned score on a given IQ test because it was equally likely that the test-taker's true IQ could fall in the range above the earned score. Dr. Hagan noted the "wide variability" in Winston's scores on individual subtests of the IQ test (Evid. Hr'g Tr. 319), and noted that "[s]everal factors can suppress scores." (Evid. Hr'g Resp't's Ex. A, at 32.) Finally, he concluded that Winston's limitations in adaptive behavior did not significantly impair his functioning.

## II.

Following the Court of Appeals' directive to consider Winston's Atkins-related ineffective assistance claim *de novo* and only to afford deference under § 2254(e)(1) "to any relevant factual findings" made by the Supreme Court of Virginia,[3] see Winston, 592 F.3d at 557-58, the court conducts the well-worn two-part analysis that Strickland v. Washington, 466 U.S. 668, requires and concludes: (1) that Winston's counsel's representation fell below an objective standard of reasonableness when he obtained, but failed to review, Winston's school records indicating that Winston was mildly retarded, and (2) that there is a reasonable probability that but for counsel's unprofessional errors, the outcome of the proceeding would have been different. As a consequence, the court will grant Winston's petition for a writ of habeas corpus, and Virginia must conduct a trial on the question of whether Winston is mentally retarded, and sentence him accordingly, or otherwise resentence him without the possibility of death.

### 1.

To satisfy Strickland's performance prong, Winston must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. Counsel is

---

[3] Respondent has filed two notices of "new authority." According to respondent, "[n]otwithstanding the mandate from the United States Court of Appeals," the Supreme Court's decisions in Cullen v. Pinholster, 131 S.Ct 1388 (2011), and Harrington v. Richter, 131 S. Ct. 770 (2011), "necessarily overrule[] the Fourth Circuit and require[] dismissal of Winston's petition . . . ." (Resp't's Notice New Auth. 1, ECF No. 165, Apr. 5, 2011.) Clearly, this is not an appropriate forum for the argument.

11

"strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. To overcome that presumption, Winston must show that counsel failed to act "reasonab[ly] considering all the circumstances." Id. at 688. In assessing counsel's performance, a reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Counsel's "strategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. "A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'" Wiggins v. Smith, 539 U.S. 510, 533 (2003) (quoting Strickland, 466 U.S. at 691). "An attorney can avoid activities that appear 'distractive from more important duties.'" Harrington, 131 S. Ct. at 789 (quoting Bobby v. Van Hook, 130 S.Ct. 13, 19 (2009) (per curiam)), in order to "formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Id. And "[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appears to be remote possibilities." Id. at 791. The court assesses "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Id. at 788 (quoting Strickland, 466 U.S. at 690)).

With these principles in mind, the court concludes that trial counsel performed deficiently on the question of whether Winston is mentally retarded and not subject to a sentence of death.

Capital defense counsel must have a command of reasonably discoverable evidence that is material to the question of life and death. Though they often must necessarily rely on paralegals, investigators, experts, and other members of the defense team to gather essential evidence, they are responsible for having a command of that evidence. Their right to rely on the opinions of experts does not relieve them of the responsibility of familiarizing themselves with the evidence they have gathered. Winston's trial counsel essentially testified that had they seen Winston's 1997 mental retardation classification, evidence that they had gathered, they would have claimed that Winston was mentally retarded and not eligible for the death penalty under Atkins and that they had no strategic reason not to pursue such a defense. But they did not review the records because they simply shipped them to their expert, Dr. Nelson, and expected him to tell them what they needed to know. As the court views it, Dr. Nelson was not responsible for telling counsel what they needed to know. Rather, they were responsible for knowing what evidence they had and for asking him searching questions raised by that evidence.

"The Sixth Amendment entitles criminal defendants to the effective assistance of counsel--that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." See Bobby, 130 S. Ct. at 16 (internal quotations omitted). To the extent that they "describe the professional norms prevailing when the representation took place," professional standards "can be useful as 'guides' to what reasonableness entails." Id. (quoting Strickland, 466 U.S. at 688). The American Bar Association's 2003 guidelines provide that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guidelines for the Appointment and Performance of Defense Counsel and Death Penalty Cases § 10.7. The standard hardly seems remarkable. But as general as the standard is, it carries

the necessary corollary that counsel must not only conduct a reasonable investigation, but he must also be familiar with it. This directive is not merely a laudatory goal, a best practice, or a most common custom in a capital case, but rather, a prevailing professional norm. Counsel must "be familiar with readily available documents necessary to an understanding of their client's case." See Hyman v. Aiken, 824 F.2d 1405, 1416 (4th Cir. 1987). Winston's counsel had in their hands, but did not read, a school record reflecting that Winston was eligible for special education due to "mild retardation" and that Winston "demonstrate[d] a reduced rate of intellectual development and a level of academic achievement below that of age peers" and "concurrently demonstrate[d] deficits in adaptive behavior." As the court noted when it first granted Winston an evidentiary hearing on his Atkins related ineffective assistance claims:

> The court is aware of and sensitive to the difficulties and burdens capital trial counsel must frequently shoulder. It is essential that they be able to delegate certain tasks and rely on expert opinions with confidence. Cf. Wilson v. Green, 155 F.3d 396, 403 (4th Cir. 1998) (observing that, where counsel had received a psychologist's opinion that defendant was not mentally ill at time of offense, "counsel was not required to second-guess the contents of this report," but rather "understandably decided not to spend valuable time pursuing what appeared to be an unfruitful line of investigation." (internal quotation marks omitted)). However, capital trial counsel cannot outsource their fundamental responsibilities.

Winston, 600 F. Supp. 2d at 732 n.14. Reading essential, reasonably available documents is one of capital counsel's fundamental responsibilities, and the court finds that counsel's failure to read the document was not reasonable under all the circumstances. Accordingly, the evidence establishes counsel's deficient performance in handling the issue of whether Winston is retarded and, under Atkins, not subject to execution.

2.

For the prejudice prong, Winston must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. Thus, the central focus of the prejudice inquiry is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). But unlike the rule of contemporary assessment which requires the court to review counsel's conduct from his perspective at the time of trial, in assessing prejudice (the probability of a different outcome), a post conviction court considers the totality of the evidence–the evidence adduced at trial, and the evidence adduced in the habeas proceeding. See Sears v. Upton, 130 S. Ct. 3259, 3267 (2010). As the Supreme Court most recently explained in Harrington:

> In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, Strickland asked whether it is "reasonably likely" the result would have been different. [Citations omitted]. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between Strickland's prejudice standard and a more probable than not standard is slight and matters "only in the rarest case." [Citations omitted]. The likelihood of a different result must be substantial, not just conceivable.

Harrington, 131 S. Ct. at 791-792.

At the evidentiary hearing, the court heard from acknowledged experts in the field of mental retardation who have reached nearly opposite conclusions on the fact-laden determination of whether, before age 18, Winston had significantly sub-average intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that was at least two standard deviations

15

below the mean, and whether he concurrently exhibited significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. Along the way, the experts have sparred over the application of the Flynn Effect and disagreed concerning the proper application of the SEM. But however viewed, Winston has no more than a borderline intellect, seemingly confirmed by unadjusted, full-scale IQ scores of 77, 73, 76, and 66, with the fourth of these being the more recent in time. This court is not called upon to decide whether Winston is mentally retarded. Rather, it is called upon to decide whether there is a reasonable probability a sentencing jury might have so concluded, had counsel read the overlooked records, followed up, raised the issue, and marshaled the evidence. Though the court cannot say that the outcome likely would be different, it can say that the likelihood of a different result is not insubstantial. Accordingly, the court finds that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different.

## III.

The Court of Appeals gave this court explicit instructions to consider all the evidence, including Winston's additional IQ score, affording deference under § 2254(e)(1) "to any relevant factual findings" made by the Supreme Court of Virginia, and affording no deference under § 2254(d) to the Supreme Court of Virginia's adjudication of the claim. The court has done so and now concludes from all the evidence it heard, including the new evidence, that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. Accordingly, the court grants Winston's petition for a writ of habeas corpus. As a consequence, Virginia must conduct a trial on the question of

16

whether Winston is mentally retarded, and sentence him accordingly, or otherwise resentence him without the possibility of death.[4]

**ENTER:** May 16, 2011.

_____
UNITED STATES DISTRICT JUDGE

---

[4] As the Court of Appeals noted, the Supreme Court of Virginia made "several factual findings entitled to deference concerning the tests Winston took and the Fairfax County assessment procedures." Winston, 592 F.3d at 557. The court directed the parties to identify all relevant factual findings entitled to deference under § 2254(e)(1). Predictably, the parties are not in agreement. The court has identified two findings it considers relevant to its current decision. Specifically, the Supreme Court of Virginia found that Winston "achieved full-scale scores of 77, 76 and 73 on three administrations of the Welsher Intelligence Scale for Children-Revised," and it found that though Winston was "once described as 'mildly mentally retarded' for purposes of special education eligibility" according to the definition Winston provided, Winston could have been so regarded even with "an IQ score above 70." Winston v. Warden of Sussex I State Prison, 2007 WL 678266, at *15. This court has made the same findings. Winston's first three full-scale scores, unadjusted for SEM or the Flynn effect, are those noted by the Supreme Court of Virginia. Winston also could have been considered mildly mentally retarded for special education purposes even with an IQ score above 70. Nevertheless, his actual score on the test associated with the special education evaluation was 66.